BARRY, Judge.
Stephen Rosiere, a police officer, was found guilty of second degree murder, La. R.S. 14:30.1, following a bench trial. After denial of motions for a post-verdict judgment of acquittal or alternatively for modification of the verdict and a new trial, Rosiere was sentenced to the mandatory life imprisonment at hard labor.
Rosiere’s appeal hinges on two arguments.[1] He argues the State failed to prove beyond a reasonable doubt that the homicide was unjustified and alternatively that the verdict should be reduced to manslaughter. He also argues that a new trial should have been granted because the State suppressed exculpatory Brady material.
Shortly after midnight on August 31, 1983 Rosiere was riding in a police car driven by Officer Fred McFarland when they noticed two people on a speeding motorcycle. The siren and blue light were turned on and a chase began which covered 2-3 miles at estimated speeds up to 95 m.p.h. As the motorcycle started up the Palmetto St. overpass the police car was about two car lengths behind and Rosiere fired one shot. The passenger, Gerard Glover, was hit and later died. No gun was found on Glover or at the scene. McFarland and Rosiere later planted a gun on the escape route taken by the motorcycle driver, Rene Brooks, who surrendered the next day.
After an on-scene investigation Rosiere and McFarland reported to the Homicide Division that gunfire came from the motorcycle and Rosiere shot back. According to a written statement by McFarland on September 1st, during the chase he saw a flash from the motorcycle and heard a loud pop which sounded like a gun. At the base of the overpass he heard a second loud pop and observed another flash and Rosiere shot back.
On September 6, 1983 McFarland was called back to Homicide to explain discrepancies in his September 1st statement.[2] McFarland contradicted his prior statements by saying Rosiere accidentally shot his gun, but the balance was correct up to his hearing gunshots. He still maintained that after a second pop and flash, Rosiere “discharged his gun” then said something like “Oh fuck.” Glover fell from the motorcycle and Rosiere said “I shot him.” McFarland explained he originally thought Rosiere shot intentionally, but from Rosi-ere’s facial expression and the tone of his voice he felt Rosiere “did not mean to shoot him.” He said Rosiere gave the impression his gun accidentally discharged.
In the September 6th statement McFarland first mentioned finding a gun, but claimed he was not aware Rosiere had planted the weapon.
At trial McFarland was granted immunity and his prior versions of the facts changed again. He testified no shots were fired at them, no motorcycle backfire occurred, and Rosiere fired without justification. McFarland claimed that as the motorcycle approached the overpass Rosiere said “I’m going to shoot” and fired one shot. Unexplainably, he saw “[b]oth flashes.” He stated Rosiere’s reaction was “I missed”, but after Glover fell off the motorcycle Rosiere said “Oh, fuck, I hit him.” McFarland testified a “108” (officer needs assistance) was radioed in after Rosiere fired, but admitted saying in prior statements the “108” was called before Rosiere fired when they believed they were shot at. McFarland said he pretended to chase the motorcycle driver but allowed him to escape. However, on the dispatcher’s tape he claimed while pursuing the motorcycle he was shot at and finally lost it. McFarland admitted he lied to the dispatcher and lied throughout the investigation.
*818 Brooks, the motorcycle driver, testified he was speeding when first observed by the police and attempted to escape because he and Glover had two outstanding traffic tickets.[3] He claimed that he and Glover did not have a gun, and admitted a prior arrest for possession of a gun. He said he did not hear a gunshot (even the fatal shot) and the motorcycle did not backfire.
Rosiere made a statement on September 2nd to the Office of Municipal Investigations. He heard a pop and saw a flash before the fleeing motorcycle got to the Palmetto overpass; then as the motorcycle went up the overpass he saw a muzzle flash, heard a pop and saw a hand.[4] Although not sure that he heard a shot the first time, Rosiere said he believed he was a target after the second “pop” and “flash.” He asked the dispatcher for assistance then responded with one shot. The dispatcher’s tape indicates the “108” call preceded Rosiere’s shot.
Delores Carter, who lived near the bottom of the overpass, testified she heard two shots.[5] Clifton Cotton, a Palmetto St. resident, was sitting under the overpass and heard sirens and two shots.[6] On rebuttal the State called Juanita Burles, a resident across the canal, who heard one shot.
An expert motorcycle mechanic, Herman Netzhammer, (hired by O.M.I.) test drove Brooks’ motorcycle at 55 mph. He said when he rode over the bump or dip at the base of the overpass his thumb accidentally hit the kill switch and when he turned the ignition back on it caused a backfire or “pop” which could have caused a flash at night. During a second test run he deliberately hit the kill switch and the engine backfired again.
In order to convict on second degree murder[7] the State must prove beyond a reasonable doubt that Rosiere had the specific intent to kill or to inflict great bodily harm when he fired the shot. Specific intent is “that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act.” La.R.S. 14:10(1). Specific intent need not be proven as a fact; it may be inferred from the circumstances of the transaction. La.R.S. 15:445; State v. Shapiro, 431 So.2d 372 (La.1982).
Rosiere’s defense is based on justification in that he acted while under the reasonable apprehension that he and McFarland were being fired upon by fleeing suspects.[8] This defense requires the *819 State to prove beyond a reasonable doubt that the homicide was committed without justification. State v. Edwards, 420 So.2d 663 (La.1982). Where circumstantial evidence is utilized to prove the offense, La. R.S. 15:438 mandates that “assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence.”
The statutory test to determine whether to grant Rosiere’s motion for a post verdict judgment of acquittal or alternatively for a modified verdict under La.C.Cr.P. Art. 821[9] utilizes the same due process standard which a reviewing court must use under Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Our Supreme Court has recognized that La.R.S. 15:438 is not a purely separate test from the Jackson standard to be applied instead of a sufficiency of the evidence test whenever circumstantial evidence forms the basis of the conviction. State v. Wright, 445 So.2d 1198 (La.1984); State v. Austin, 399 So.2d 158 (La.1981). Exclusion of every reasonable hypothesis of innocence is a component of the more comprehensive reasonable doubt standard in such cases. State v. Wright, supra.
R.S. 15:438 emphasizes the need for careful observation of the usual standard and provides a methodology for its implementation. State v. Nealy, 450 So.2d 634 (La.1984). In order for the trial court to grant a post verdict motion for acquittal or for an appellate court to reverse a conviction, the test is whether any rational trier of fact viewing the evidence, both direct and that inferred from the circumstances, in the light most favorable to the State could have found the defendant guilty beyond a reasonable doubt of every essential element of the crime. State v. Captville, 448 So.2d 676 (La.1984). See also State v. Morris, 414 So.2d 320 (La.1982).
To carry its heavy burden the prosecution relied on three witnesses. The primary witness, McFarland, admitted lying in all of his pre-trial statements and to the dispatcher. He changed his story from a justified intentional shooting to an accidental shooting to his immunized testimony that Rosiere said “I am going to shoot.” Rosiere’s statement, made at night during a high speed chase, is susceptible of multiple interpretations, such as the shot was a warning to stop. Rosiere’s reaction “I missed,” then after Glover fell off the motorcycle, “Oh, fuck, I hit him,” clearly refutes the state’s proof of the statutory intent to kill or inflict bodily harm. McFarland lacks credibility and is not worthy of belief.
Brooks’ testimony has little, if any, probative value. The number of shots (sounds) is uncertain. The testimony is not beneficial to the state’s ease.
The totality of the State’s case is weak, at best, and woefully insufficient to convict. The evidence does not exclude the hypothesis that Rosiere acted justifiably out of apprehension. Nor does it exclude the reasonable belief that Rosiere did not intend to shoot Glover. We do not believe *820 a rational trier of fact,[10] viewing the direct and circumstantial evidence in the light most favorable to the prosecution, could conclude that the requisite elements of second degree murder, primarily specific intent, have been proven beyond a reasonable doubt.
We need not discuss defendant’s assignment relating to Brady material. However, we note that a statement by William Helfand[11] was wrongfully withheld from the defense in answer to its broad request for exculpatory material. Helfand said he arrived at the scene seconds after Rosiere and McFarland and one of the officers yelled to be careful because the suspect on the ground had a gun, and then the suspect was patted down. Helfand stated Rosiere told him they had been fired at and he shot once.
With reference to Helfand’s statement, the judge noted there was “[n]o time to concoct a story at that junction.” The State also did not produce a statement from off-duty narcotics Officer Michael Glasser who verified he heard the “108” called in prior to the shooting. Glasser confirmed Helfand arrived immediately after the shooting.[12]
The suppressed statements were crucial to Rosiere’s defense. The trial judge noted that Helfand’s testimony “could have made a whale of a difference” to the defense. We agree. The state acted improperly and the new trial motion (now moot) should have been granted.
Defendant’s conviction is reversed.[13]
REVERSED.

. Rosiere’s third assignment of error relating to the Motion to Suppress was neither briefed nor argued and is deemed abandoned. State v. Joseph, 425 So.2d 1261 (La.1983).

. McFarland said he lost the motorcycle going over the overpass, but on the dispatcher’s tape he claims that he lost it on Bamboo Road.

. When he was first questioned by the State as to why he ran from the police, he testified that he “turned around and asked Gerard" and they both agreed to try to outrun the police car. When the defense pointed this out to Brooks, he stated that besides asking Glover, he had the traffic violations.'

. The trial testimony of the Deputy Director of O.M.I., Raymond Reed, recounted Rosiere's statemént that the first pop and flash occurred when the motorcycle "got to the up ramp,” but the transcribed statement of Rosiere declares that the first occurrence happened earlier when the bike unsuccessfully attempted to cross the canal. Reed stated that Rosiere saw an arm, but Rosiere’s statement says it was a hand.

. On September 7, 1983 a bullet was found at the top of the overpass by O.M.I. investigators. The State's expert, Sgt. Allen Tidwell, testified the spent pellet was not consistent with police ammunition and it was impossible to determine what weapon fired it. He said there were indications Rosiere’s gun had been fired once.

. Cotton said he thought both shots were fired from the same gun.

. La.R.S. 14:30.1 provides:
Second degree murder is the killing of a human being: (1) When the offender has a specific intent to kill or to inflict great bodily harm; or (2) When the offender is engaged in the perpetration or attempted perpetration of aggravated rape, aggravated arson, aggravated burglary, aggravated kidnapping, aggravated escape, armed robbery, or simple robbery, even though he has no intent to kill or to inflict great bodily harm. Whoever commits the crime of second degree murder shall be punished by life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence.

. La.R.S. 14:20 provides (in pertinent part):
A homicide is justifiable: (1) When committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger; or (2) When committed, for the pur *819 pose of preventing a violent or forcible felony involving danger to life or of great bodily harm, by one who reasonably believes that such an offense is about to be committed and that such action is necessary for its prevention. The circumstances must be sufficient to excite the fear of a reasonable person that there would be serious danger to his own life or person if he attempted to prevent the felony without the killing.

. La.C.Cr.P. Art. 821 provides (in pertinent part):
(A)The defendant may move for a post verdict judgment of acquittal following the verdict.
A motion for a post verdict judgment of acquittal must be made and disposed of before sentence.
(B) A post verdict judgment of acquittal shall be granted only if the court finds that the evidence, viewed in a light most favorable to the state, does not reasonably permit a finding of guilty.
(C) If the court finds that the evidence, viewed in a light most favorable to the state, supports only a conviction of a lesser included responsive offense, the court, in lieu of granting a post verdict judgment of acquittal, may modify the verdict and render a judgment of conviction on the lesser included responsive offense.

. The “rational trier of fact” rule obviously does not mean that after conviction, especially from a bench trial, appellate courts cannot review the facts to satisfy sufficiency. Our trial colleague is certainly rational; however, we are mandated to a full review of the facts and law in every case to satisfy a conviction.

. The name of William Helfand, a reserve officer and part-time emergency medical technician for the department, was given to the defense but there was no mention of his statement. The name of the woman with Helfand, Donna Oak-leaf, was not provided. Helfand's O.M.I. statement (similar to one made to the Homicide Division) was provided pre-trial for in camera inspection.

. The defense was not aware of Glasser’s statement until its inclusion in the in camera exhibits. Thus, the initial argument relating to its importance appears in the defense brief.

. The conduct of McFarland and Rosiere after the shooting, i.e., their lies and planting a gun, is reprehensible, inexcusable, and a disgrace to law enforcement.