488 So.2d 965 (1986)
STATE of Louisiana
v.
Stephen ROSIERE.
No. 85-K-2215.
Supreme Court of Louisiana.
May 20, 1986.
*966 William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Harry F. Connick, Dist. Atty., Michael McMahon, Asst. Dist. Atty., for plaintiff-applicant.
Joseph Meyer, Jr., Arthur A. Lemann, III, Lemann, O'Hara & Miles, New Orleans, for defendant-respondent.
MARCUS, Justice.
Stephen Rosiere was indicted by the grand jury with the second degree murder of Gerald Glover in violation of La.R.S. 14:30.1. After a bench trial, defendant was found guilty as charged. Defendant moved for a post verdict judgment of acquittal contending that the state failed to prove that he was guilty of second degree murder and for a new trial on the ground that the state had material exculpatory information which it had failed to turn over to him. The trial judge denied defendant's motions and sentenced him to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. The court of appeal reversed defendant's conviction finding insufficient evidence to support the conviction. The court also found that the motion for a new trial, although moot, should have been granted because the state suppressed material exculpatory evidence.[1] Upon the state's application, we granted certiorari to review the correctness of that decision.[2]

Sufficiency of Evidence
The state contends that the court of appeal erred in reversing defendant's conviction on the ground of insufficient evidence. It argues that there was sufficient evidence to prove that defendant killed Glover with specific intent and without justification.
At trial Fred McFarland, a New Orleans police officer and the state's key witness, *967 testified that shortly after midnight on August 31, 1983 the patrol car which he was driving and in which defendant was a passenger was proceeding south on Louisiana Avenue when he observed two males on a motorcycle traveling at a high rate of speed in a northerly direction. As he made a U-turn, defendant turned on the lights and siren. The motorcycle did not pull over; it accelerated. The patrol car pursued it believing that the riders may have committed a serious crime. Defendant notified the dispatcher of their situation, the motorcycle's license number and their need for assistance. As the motorcycle began up the Palmetto overpass, the police unit was only two car lengths behind, after having pursued the suspects for two to three miles at speeds in excess of seventy miles per hour. At this point defendant announced, "I'm going to shoot," leaned out the window, took aim and fired. Initially nothing happened and he commented, "I missed." Seconds later, however, Glover toppled off the back of the bike. Defendant's response was, "Oh fuck, I hit him." According to McFarland, the suspects had not fired any shots at the patrol car, nor had there been any pops, flashes or sparks, in the vicinity of the motorcycle which one might have mistaken for gunfire. After realizing what had happened, defendant asked, "What am I going to do now?"
McFarland further testified that within seconds the coverup began: defendant called in a "108"notified the dispatcher that officers were being shot at. As McFarland pulled the car over to the side, he and defendant began to concoct their coverup. The two officers got out of the car and approached the body. Shortly thereafter, McFarland returned to the car and proceeded after the motorcycle. He stated that prior to his departure, no one had yet arrived at the scene. McFarland drove down the overpass, stopped the car and let the motorcycle escape because the biker could verify that no shots had been fired from the motorcycle. Furthermore, he called in another "108" providing additional support to their coverup. He then returned to the scene and picked up defendant. They drove down the overpass, and defendant took an old rusted automatic, which he had retrieved from the trunk, and dropped it out the window. Not long afterward, a police officer recovered the drop gun.
An hour after the shooting, McFarland gave a statement to New Orleans Police Department (NOPD) homicide detectives in which he contended that defendant did not shoot until after the bikers had shot at the police car. A few days later, after talking to defendant, McFarland gave another statement in which he claimed that the shooting had been accidental. Finally, after being confronted with various discrepancies in his statements and being offered immunity, McFarland agreed to testify truthfully at defendant's trial.
Rene Brooks, the driver of the motorcycle, corroborated McFarland's testimony. He testified that neither he nor Glover were armed and that during the chase he had not hit the kill switch on his motorcycle and his bike had not backfired. The remainder of the state's case consisted of testimony by a Palmetto Street resident who had heard only one shot fired and of physical evidence which described the scene and which established that defendant's gun was the murder weapon.
Defendant's case consisted primarily of testimony from two Palmetto Street residents, a motorcycle expert and an investigator from the New Orleans Office of Municipal Investigations. The two residents testified that on the night Glover was killed they had heard two shots fired only seconds apart on the Palmetto overpass. The expert's testimony established that if Brooks had hit the kill switch his motorcycle would have backfired and that at night this backfire would be accompanied by a small flash which one might mistake for a muzzle flash.[3] Finally, the investigator *968 testified that the day after the shooting he had taken a statement from defendant in which defendant said he returned fire because he had believed the motorcyclists were shooting at him. The investigator also recounted that in a search of the Palmetto overpass conducted a week after the shooting, he had recovered a lead pellet which was not consistent with police ammunition.
After reviewing the evidence adduced at trial, the trial judge concluded that the state had proved defendant's guilt beyond a reasonable doubt and therefore denied defendant's motion for a post verdict judgment of acquittal. The court of appeal in reversing defendant's conviction found that "McFarland lacks credibility and is not worthy of belief" and "Brook's testimony has little, if any, probative value." Having discredited the state's two key witnesses, the court concluded that the "totality of the State's case is weak, at best, and woefully insufficient to convict." In rejecting the trial judge's findings and making independent determinations as to McFarland's credibility and the probative value of Brook's testimony, the court of appeal erred. It is not the function of an appellate court to assess credibility or reweigh the evidence. Appellate review for minimal constitutional sufficiency of evidence is a limited one restricted by the standard developed in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). State v. Trosclair, 443 So.2d 1098 (La.1983); State v. Richardson, 425 So.2d 1228 (La.1983).
The constitutional standard for testing the sufficiency of evidence, enunciated in Jackson v. Virginia requires that a conviction be based on proof sufficient for any rational trier of fact, viewing the evidence in the light most favorable to the prosecution, to find the essential elements of the crime charged beyond a reasonable doubt. When circumstantial evidence is used to prove the commission of the offense, La. R.S. 15:438 mandates that "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." This is not a purely separate test from the Jackson sufficiency standard to be applied instead of a sufficiency of the evidence test whenever circumstantial evidence forms the basis of the conviction. Ultimately, all evidence, both direct and circumstantial, must be sufficient under Jackson to satisfy a rational juror that the defendant is guilty beyond a reasonable doubt. Due process requires no greater burden. State v. Garcia, 483 So.2d 953 (La.1986); State v. Poretto, 468 So.2d 1142 (La.1985). State v. Wright, 445 So.2d 1198 (La.1984).
Second degree murder is the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm. La.R.S. 14:30.1(1).[4] When a defendant claims self-defense, the state has the burden of establishing beyond a reasonable doubt that he did not act in self-defense. State v. Garcia, supra; State v. Matthews, 464 So.2d 298 (La.1985); State v. Patterson, 295 So.2d 792 (La.1974); State v. Ardoin, 128 La. 14, 54 So. 407 (1911). La.R.S. 14:20 reads in pertinent part as follows:
A homicide is justifiable:
(1) When committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger....
There is no issue as to whether defendant killed Glover. The only question is whether defendant acted with specific intent and without justification. Thus, the *969 relevant inquiry in the instant case is whether a rational factfinder, after viewing the evidence in the light most favorable to the prosecution, could have found beyond a reasonable doubt that defendant had specific intent and did not act in self-defense.
In the instant case, testimony established that the following sequence of events occurred as the motorcycle and police car approached the Palmetto overpass: defendant told McFarland, "I'm going to shoot," leaned out of the car window, took aim at the fleeing suspects and fired one round from his .357 magnum. As the trial judge noted, a trained police officer who aims and fires his service revolver in the direction of a fellow human being knows that either death or great bodily harm will occur. Witnesses also testified that the bikers were unarmed and that no pops, flashes or anything else that could have been interpreted as gunfire came from the motorcycle. Under these circumstances, we find that the state met its burden of proof, that is, viewing the evidence in the light most favorable to the prosecution, a rational factfinder could have found beyond a reasonable doubt that defendant had the specific intent to kill Glover and did not act in self-defense. The court of appeal erred in finding to the contrary and in reversing defendant's conviction on this ground. The trial judge correctly denied defendant's motion for a post verdict judgment of acquittal.

The Brady Question
The state further contends that the court of appeal erred in finding that because the state had improperly withheld exculpatory, material information crucial to Rosiere's defense, the motion for a new trial should have been granted.[5] It argues that the statements which it withheld from the defense were neither exculpatory nor material.
In his pretrial motion for discovery, defendant requested "[a]ny and all evidence, of whatever nature, that may be deemed exculpatory as to the defendant, no matter how tenuous the exculpation." In response, the state provided defendant with the names and addresses of four individuals, Herman Netzhammer, Clifton Cotton, Delores Carter and William Helfand, along with a copy of Netzhammer's report on his test drive of Brook's motorcycle. However, the state did not disclose the names of two other witnesses, Donna Oakleaf and Michael Glasser, or statements given to NOPD homicide detectives by Helfand, Oakleaf and Glasser.
In his statement Helfand, a Tulane University student who worked part-time as an emergency medical technician for the NOPD, recounted that on the night of the shooting he was driving on Palmetto Street with his girlfriend, Donna Oakleaf, when a motorcycle pursued by a police car sped by in the opposite direction. Helfand made a U-turn and began following the police car. When he was half way up the Palmetto overpass, the police car, which was at the top, quickly pulled over to the right. Upon reaching the crest of the incline, Helfand saw a body in the middle of the road. He parked his car and began to get out. At that moment, one of the police officers yelled that "the man on the ground had a gun." Helfand ducked back into his car. After the officers had searched the suspect for a weapon, Helfand grabbed his medical bag, approached the wounded man and began administering first aid. Defendant told him that one of the men on the motorcycle "had popped a cap at us."[6] McFarland had returned to the patrol car and continued the chase. According to Helfand, McFarland left the overpass at a high rate of speed and at no time prior to *970 McFarland's departure did he observe the two officers conversing.[7] In her statement, Oakleaf did not mention the warning or explanation given Helfand by the police officers; however, her account corroborates much of what her boyfriend said.
In his statement, Glasser, a narcotics officer with the NOPD, told the homicide detectives that he was waiting at a red light when the motorcycle and police car passed in front of him.[8] He turned right and joined the chase. When he was a quarter of a mile from the overpass, he heard the "108." Fifteen seconds later he arrived at the scene. He saw a white male getting out of a small car (presumably Helfand) and a police officer standing over a body. The patrol car had resumed the chase of the motorcycle. Realizing that he could do nothing for the victim, Glasser went to assist McFarland.
Upon learning of the undisclosed information, defendant filed a motion for a new trial.[9] During the hearing on this motion, the trial judge found that
it is exculpatory material. It would have been critical to the defense's case.... And it could have made a whale of a difference.... I'm of the firm belief that you [defendant] should have been provided with a copy of that statment [sic].
After reviewing the grand jury testimony of Helfand, Oakleaf and defendant, the judge, without assigning reasons, denied defendant's motion.[10]
The court of appeal agreed with the trial judge's findings: "The suppressed statements were crucial to Rosiere's defense." However, it disagreed with his ruling. Accordingly, it held that: "The state acted improperly and the new trial motion (now moot) should have been granted." We agree.
In Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the United States Supreme Court held that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material to either guilt or punishment. The Brady rule is based on the requirement of due process. Its purpose is not to displace the adversary system as the primary means by which truth is uncovered, but to ensure that a miscarriage of justice does not occur. Thus, the prosecutor is not required to deliver his entire file to defense counsel, but only to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial, that is, evidence favorable to defendant which is material to guilt or punishment.[11] The test for determining materiality was firmly established in United States v. Bagley, ___ U.S. ___, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine *971 confidence in the outcome. United States v. Bagley, supra.[12]
In the instant case, defendant claimed justification. Thus, a primary issue was whether defendant reasonably believed that he was in imminent danger of losing his life or receiving great bodily harm. La. R.S. 14:20. Helfand's statement, which was corroborated by Oakleaf and Glasser, contained facts from which a rational trier could infer that defendant had believed he was being shot at by the motorcyclists. Prior to Helfand's arrival, there was little time for the officers to concoct a coverup, and he told the detectives that after he arrived McFarland and defendant did not converse at all. Yet, only moments after the shooting, as Helfand was getting out of his car, one of the officers yelled the warning that the man on the ground had a gun, and not long afterward defendant explained to him that the suspects had "popped a cap at us." Additionally, Helfand stated that when McFarland resumed the chase of the motorcycle, he drove away at a high rate of speed which indicates that the officer's pursuit of Brooks was in earnest, perhaps because he then thought that shots had been fired at the patrol car. Furthermore, the statements of Helfand and Oakleaf cast doubt on McFarland's credibility. McFarland testified that when he left defendant on the overpass with the victim, no one had yet arrived. This testimony is directly contradicted by the statements of Helfand and Oakleaf in which they told detectives that they arrived on the scene prior to McFarland's leaving to continue his pursuit of Brooks.
In addition to its corroborative value, Glasser's statement contains independent facts which are relevant to the justification issue. Glasser told the homicide detectives that he heard the "108" fifteen seconds before he arrived on the scene. This information would assist the factfinder in determining when defendant called in the "108." A determination that the "108" was given before defendant shot at Glover would support a finding that defendant returned fire because he thought the motorcyclists were shooting at him.
Under these circumstances, our confidence in the outcome of the trial is undermined. Thus, there is a "reasonable probability" that, had the statements of Helfand, Oakleaf and Glasser been disclosed to defendant, the result of the proceeding would have been different, that is, the statements are material. In addition, since the suppressed evidence supports defendant's claim that the homicide was justifiable and contradicts portions of McFarland's testimony, it is clearly favorable to defendant. Because the statements are both favorable to defendant and material, the prosecutor had a duty to disclose them. He improperly failed to do so. The trial judge erred in denying the motion for a new trial. The court of appeal correctly found that the new trial should have been granted. Accordingly, the case must be remanded for a new trial.

Decree
The judgment of the court of appeal reversing defendant's conviction on the ground of insufficient evidence is reversed. Defendant's motion for a new trial is granted; his conviction and sentence are set aside, and the case is remanded to the district court for a new trial.
DIXON, C.J., and LEMMON, J., concur.
NOTES
[1] 476 So.2d 816 (La.App.4th Cir.1985).
[2] 481 So.2d 1325 (La.1986).
[3] The expert had discovered this fact accidentally while test driving the motorcycle along the chase route. As he was approaching the Palmetto overpass, he hit a dip which caused his thumb to hit the kill switch. When he turned the switch back on, the bike backfired. He intentionally manipulated the switch twice more, each time producing a backfire.
[4] Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act. La. R.S. 14:10(1). Although intent is a question of fact, it need not be proven as a fact; it may be inferred from the circumstances of the transaction. La.R.S. 15:445.
[5] The court of appeal made this finding after having concluded that there was insufficient evidence to convict. Thus, it noted that the motion for a new trial was then moot. Since we have found that there was sufficient evidence to convict, the motion is no longer moot. Therefore, we must determine whether defendant is entitled to a new trial.
[6] Helfand stated that he interpreted this phrase to mean that the motorcyclists had fired a shot at the officers.
[7] These facts, concerning the speed of McFarland's departure and the lack of conversation between the two officers, were discussed by Helfand in his grand jury testimony which, upon the state's request, was reviewed by the trial judge prior to his ruling on the new trial motion.
[8] Glasser gave statements to the homicide detectives on three separate occasions.
[9] Glasser's statements were among the in camera exhibits reviewed by the judge before trial. Defendant did not gain access to these exhibits until preparing for his appeal. During his examination of these exhibits, he discovered Glasser's statements for the first time. Thus, the initial argument relating to the importance of the officer's statements appears in defendant's appellate brief.
[10] We reject the state's contention that because the trial judge had been the trier of fact special weight should be given to his ruling. When the judge is called upon to determine whether evidence suppressed at trial is material, he is not to determine whether it would have affected his decision. Rather, he is required to make an objective determination. Thus, our standard of review is unaffected by the fact that the trial judge was also the factfinder.
[11] Evidence favorable to defendant includes both exculpatory and impeachment evidence. United States v. Bagley, ___ U.S. ___, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985).
[12] In United States v. Agurs, 427 U.S. 97 (1976), the Court suggested that the test for materiality may differ depending on the type of discovery request made by defendant. It noted that the test might be more lenient to the defense when the request was specific, as opposed to when there is no request or only a general request. In Bagley, the Court rejected this distinction ruling that its standard of materiality was "sufficiently flexible to cover the `no request,' `general request,' and `specific request' cases for prosecutorial failure to disclose evidence favorable to the accused...." United States v. Bagley, supra.