542 So.2d 156 (1989)
STATE of Louisiana
v.
Carlton R. GREENE.
No. KA 88 1095.
Court of Appeal of Louisiana, First Circuit.
April 11, 1989.
Bryan Bush, Dist. Atty., Baton Rouge by Howell, Asst. Dist. Atty., for plaintiff-appellee.
Kevin P. Monahan, Baton Rouge, for defendant-appellant.
Before CARTER, LANIER and LeBLANC, JJ.
LANIER, Judge.
Defendant, Carlton Ray Greene,[1] was charged by a grand jury indictment with aggravated rape (Count I) and aggravated burglary (Count II), violations of La.R.S. 14:42 and 14:60, respectively. He was tried by a jury which convicted him as charged. The trial court sentenced him to consecutive terms of imprisonment at hard labor for life, without benefit of parole, probation or suspension of sentence on Count I, and for thirty years on Count II. This appeal followed.

FACTS
At about 5:30 a.m. on October 1, 1982, a man entered the bedroom of the victim's apartment. The victim occupied the apartment with her two-year old daughter. Almost immediately, the man got on top of the victim, placing one of his hands over her nose and mouth and the other around her throat. When the victim "went limp," the attacker ceased strangling her and informed her he was armed with a knife and would kill her and her daughter by slitting their throats, if she did not do as she was told.
While repeating his threat to kill the victim and her daughter, the assailant raped the victim vaginally and anally, made her perform oral sex on him and told her that he might rape her daughter too. Thereafter, the perpetrator again forced the victim to perform oral sex on him. He then told the victim to stand up, that he could either slit her throat or "knock [her] out," and asked her which did she want. The victim replied that she chose the latter. *157 The rapist then struck the side of the victim's head. She fell and apparently feigned unconsciousness. However, her assailant told her he knew she was faking it and to get up. After threatening to kick the victim if she did not get up, he kicked her. She then arose. The perpetrator then made the victim give him her money, totaling about forty dollars. After taking the money, he again raped the victim vaginally.
Thereafter, the assailant left the bedroom and went into the kitchen. The victim heard her apartment door shut and surmised the attacker had left. She walked out the front of the apartment and looked around. She did not see the perpetrator. She discovered an open window in her living room with its screen frame "all bent out." When she had moved into the apartment earlier the day before, the frame was in good condition. The window had been closed when she went to bed, and she thought she had locked it at that time.
Upon reentering the apartment, the victim locked the living room window and telephoned a friend who came to her apartment within minutes. The friend convinced her to call the police.
During the commission of the offenses, the perpetrator threatened to kill the victim if she looked at him and there were poor lighting conditions inside the victim's apartment. The victim did not identify defendant, and no in-court or out-of-court identification procedure to identify defendant[2] was ever employed. However, the victim did furnish the police with a description of the perpetrator.
On the same day the instant offenses were committed, the police obtained an arrest warrant for the defendant based upon information that (1) Phillip Avery Christopher loaned his car to Carlton Ray Greene on the morning of the offenses, (2) keys found on the victim's bed fit Christopher's car, (3) Greene's fingerprints matched latent fingerprints lifted from the frames of two window screens at the victim's apartment, and (4) defendant fit the victim's description of the perpetrator. On January 24, 1987, defendant was arrested in Opelousas, Louisiana, by officers of the Opelousas City Police Department. At the time of his arrest, defendant was advised of his Miranda rights.

MISTRIAL BASED ON RACIAL REMARK

(Assignment of Error Number 3)[3]
Defendant asserts the trial court erred by not granting his motion for mistrial when the prosecutor made prejudicial, racist remarks during her closing argument to the jury. He argues that, because the remarks were not material and relevant, La.C.Cr.P. art. 770 mandated a mistrial and the trial court's admonition to the jury to disregard the remarks was insufficient.
La.C.Cr.P. art. 770 provides, in pertinent part, as follows:
Upon motion of a defendant, a mistrial shall be ordered when a remark or comment, made within the hearing of the jury by the judge, district attorney, or a court official, during the trial or in argument, refers directly or indirectly to:
(1) Race, religion, color or national origin, if the remark or comment is not material and relevant and might create prejudice against the defendant in the mind of the jury[.]
. . . .
An admonition to the jury to disregard the remark or comment shall not be sufficient *158 to prevent a mistrial. If the defendant, however, requests that only an admonition be given, the court shall admonish the jury to disregard the remark or comment but shall not declare a mistrial.
During his closing argument to the jury, defense counsel intimated that Phillip Avery Christopher might have committed the instant offenses. Thereafter, during the prosecutor's rebuttal closing argument, she apparently sought to refute that assertion with the following:
Phillip Avery Christopher doesn't even know Eula Booker. Eula Booker doesn't know Phillip Avery Christopher. Why would he happen to be at 242 Edison Street a few hours after Carlton Green [sic] happened to be there. Phillip Avery Christopher had never been there before. Why would he just happen to go to that location. He didn't know this lady from Adam. She didn't know him either. But he [defendant] did have a reason to come back. He was interested in Eula Booker. He went to Eula Booker's apartment that morning and when he found a man there, he went to the next best place, a place where he saw a nice white lady moving in that day. That's why.
Thereupon, the jury was removed from the courtroom, and, out of the jury's presence, defense counsel requested a mistrial on the basis that the prosecutor's remarks amounted to a reference to defendant's race prohibited by La.C.Cr.P. art. 770. In denying the requested mistrial, the court ruled that it would admonish the jury to disregard the prosecutor's remarks, if defense counsel so desired. After defense counsel agreed to the admonition, he reiterated his objection to the ruling denying a mistrial. The jury was returned, and the court admonished the jury to disregard any statement of the prosecutor "referring in any way, shape or form to anyone's race."
Testimony given at trial by Eula Booker provides background for and sheds light upon the context in which the prosecutor's remarks were made. Booker related that, on the day preceding the instant offense, she was in the process of moving out of her apartment and defendant assisted her in moving. While defendant was with her in the kitchen, he "touched her" and wanted to know if she lived alone. She told defendant she lived with Charles Barksdale, who was working in New Orleans. She last saw defendant at about 8:00 p.m. While moving, she saw a "white lady" moving into the apartment next door (the victim's apartment); the defendant was present at that time. Charles Barksdale came home at about midnight. Later, at about 4:00-4:30 a.m. the following morning, she heard a knock at the door. Barksdale went to the door but did not let anyone inside; she did not see who had been at the door. About thirty minutes later, she heard noise next door, which sounded like someone fighting.
Although the prosecutor referred to race in her closing argument, not every reference to race requires the granting of a mistrial. State v. Jenkins, 340 So.2d 157 (La.1976). For example, race may be a valid method of identification and, thus, material and relevant. State v. Jenkins, 340 So.2d at 178. The prosecutor's remarks essentially recapitulated a portion of Eula Booker's testimony to refute any suggestion raised in defense counsel's closing argument that Phillip Avery Christopher might have committed these offenses. When the entire record is considered, particularly the context in which the reference was made, it appears there was no attempt by the prosecutor to pursue a racial issue to prejudice defendant. Cf. State v. Tatum, 506 So.2d 584 (La.App. 4th Cir.1987). Consequently, the prosecutor's remark was not the type proscribed by La.C.Cr.P. art. 770.
This assignment of error is without merit.

SUFFICIENCY OF EVIDENCE

(Assignment of Error Number 4)
Defendant contends the verdicts are contrary to the law and the evidence. His argument is premised on the absence of the victim's identification of him as the perpetrator. He further contends the only evidence linking him to the offenses was a palm print outside the victim's apartment. *159 He asserts he could have left the palm print there while helping the victim's neighbor move prior to the offenses and this evidence is insufficient to convict him.
When reviewing the sufficiency of the evidence to support a conviction, an appellate court must determine if the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime and defendant's identity as perpetrator of that crime were proved beyond a reasonable doubt. La.C.Cr.P. art. 821; State v. Captville, 448 So.2d 676 (La. 1984). When circumstantial evidence is used to prove the commission of a crime, La.R.S. 15:438 provides that, assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence. Ultimately, all evidence, both direct and circumstantial, must be sufficient to satisfy a rational juror that the defendant is guilty beyond a reasonable doubt. State v. Rosiere, 488 So.2d 965 (La.1986).
Evidence introduced at trial revealed that, on the day preceding the offenses, Eula Booker began moving out of her apartment located next door to the apartment into which the victim was then moving. Defendant was assisting Booker at the time. While in Booker's kitchen with her, defendant's apparent sexual advances directed toward Booker were interrupted by the boyfriend of Booker's sister, Zeik Murphy, who was also assisting Booker in moving. Prior to the interruption, defendant had "touched her" and had asked her if she lived alone, and Booker had told defendant she lived with Charles Barksdale, who was working in New Orleans at the time.
Booker last saw defendant at about 8:00 p.m. on September 30. Thereafter, at about midnight, Charles Barksdale came to Booker's apartment, and the two of them spent the night there sleeping on the floor. Booker finished moving the following day.
Booker testified that, at about 4:00-4:30 a.m., she woke up when she heard someone knocking at the door to her apartment. Barksdale answered the knock at the door. He did not allow anyone to enter the apartment, and Booker did not see the person who was at the door. Booker further testified that about thirty minutes later she heard noise next door which sounded like someone fighting.
The victim testified that, at about 5:30 a.m., she was awakened while sleeping in her bed and observed the perpetrator come into her bedroom. Before the victim could say anything, the perpetrator was on top of her using one of his hands to cover her mouth and nose and his other hand to grab hold of her throat. The victim stated that, when she "went limp," the perpetrator told her he had a knife in his pocket and that, if she failed to do as she was told, he would kill her and her child by slitting their throats. Thereafter, the perpetrator raped the victim several times and stole about forty dollars from her before leaving the scene.
During the police investigation which followed, a light brown 1977 Ford LTD was found parked in a parking lot near the victim's apartment. The police determined the owner of the car to be Phillip Avery Christopher.
The testimony of Christopher and Dionne Bates revealed that, on the day of the offenses, Christopher and defendant were living in Baton Rouge at the residence of defendant's brother, Clayton Greene, and Ms. Bates.
Christopher testified that, on the day of the offenses at about 2:30-3:30 a.m., defendant asked for and received Christopher's permission to use his car. Christopher identified state exhibit eight, the keys and keyring the victim found in her bed after the offenses, as the keys and keyring belonging to him which he had given to defendant with the car.
On the day of the offenses, law enforcement agents detected fingerprints and a palm print at the crime scene. A latent left thumb print (state exhibit thirty) was lifted from the inside portion of the window screen frame to the victim's living room window, which window had apparently served as the point of entry used by the perpetrator. A latent right index fingerprint *160 (state exhibit thirty-one) was lifted from the outside of a window screen frame that had also been pried and/or pulled away from another window to the victim's apartment, and a fingerprint camera was used to make photographs (state exhibits thirty-three and thirty-four) of a left palm print found inside the victim's apartment on the windowsill of the living room (entrance) window. Carol Richard, an expert in the field of fingerprint identification, compared the latent fingerprints (state exhibits thirty and thirty-one) and the palm print depicted in the photographs (state exhibits thirty-three and thirty-four) to known prints of defendant and concluded that the latent fingerprints and the palm print depicted in the photographs were positively those of defendant.
Applying the statutory rule for circumstantial evidence as a component of the more comprehensive reasonable doubt standard, we find that the evidence supports the jury's verdicts of guilty. The evidence sufficiently proved the elements of the instant offenses and defendant's identity as the perpetrator of those offenses beyond a reasonable doubt.
This assignment of error is without merit.

DECREE
For the foregoing reasons, the conviction and sentence are affirmed.
AFFIRMED.
NOTES
[1] In the pleadings, the defendant's name is spelled "Greene." In the transcript, it is spelled "Green."
[2] The police received the report of the instant offenses at about 6:56 a.m. on October 1, 1982. At about 7:30 a.m., Lenon Tate (who lived across the street from the victim's apartment) was stopped and detained as a suspect in the case for about an hour. The victim was brought to the location of the stop, but she advised the police that Tate was not the perpetrator.
[3] Assignments of error numbers one and two were not briefed on appeal and, therefore, are considered abandoned. Uniform RulesCourts of Appeal, Rule 2-12.4. In a fifth assignment of error, defendant requests this court to review the record for errors patent. Even if defendant did not assert the existence of an error patent and discoverable upon the mere inspection of the pleadings and minutes, such error would be noted ex proprio motu. La.C.Cr.P. art. 920. Our review of the instant appellate record fails to reveal any such error.