bCLAIBORNE, Judge Pro Tem.
Defendant, Jerry Emmett Olivier, was charged by bill of information' with third offense driving while intoxicated (DWI), a violation of La. R.S. 14:98. After trial by jury, defendant was found guilty as charged. The trial court sentenced defendant to imprisonment at hard labor for five years without benefit of parole, probation or suspension of sentence. Defendant has appealed, urging in a single assignment of error that the evidence is insufficient to support his conviction.
On November 14, 1996, shortly after 10:30 p.m., Louisiana State Trooper James Bentley was traveling southbound in his police unit on LA 44 (a two-lane highway), when he observed defendant’s northbound vehicle approaching. Defendant’s vehicle was moving from “side to side” and “ran well off’ the roadway crossing the center-line of the highway as it passed Bentley’s unit. Bentley turned his unit around and followed defendant’s vehicle a distance of about a mile and one-half. While doing so, Bentley observed defendant’s vehicle run off the right side of the road four times *994 and cross the centerline five times. Two of the times defendant drove off the road, he drove far enough that the vehicle “threw dust up badly” and Bentley also observed the vehicle cross the centerline a distance of two feet into the opposing lane. At that point, Bentley activated the emergency lights on his unit and stopped defendant’s vehicle in a well-lit area at a service station.
Bentley advised defendant to exit his vehicle, which was also occupied by a single passenger, Liz Mixon. It took several instructions from Bentley before defendant exited the vehicle. Defendant’s movement was “real slow” and he “seemed very unsteady” as he exited the vehicle. Bentley met defendant to |3the left of the two vehicles. Defendant’s walking was “jerky,” and when defendant stopped, he had to take another step to maintain his balance. Bentley informed defendant he was stopped for improper lane usage and asked defendant for his driver’s license. Defendant “fumbled badly” with his wallet and had trouble producing the license, i.e., defendant was “rather thick-handed having to — just having trouble manipulating his hands.”
Bentley asked defendant if defendant had been drinking, and defendant answered that he had consumed four or five beers at Sedgie’s. Bentley also asked defendant to perform the standardized field sobriety test consisting of the horizontal gaze nystagmus, walk-and-turn, and one-leg-stand tests. Bentley administered all three tests. Bentley was in charge of Louisiana State Police Troop A’s DWI Task Force. During his sixteen years as a law enforcement officer (eight of which were as a trooper and eight as a Denham Springs police officer), Bentley had made about fifteen hundred to two thousand stops of suspected DWI drivers.
Bentley testified that he was trained and certified in the administration of the horizontal gaze nystagmus test and that it had been shown that consumption of a large amount of alcohol will induce a horizontal gaze nystagmus in the eye. The onset of nystagmus prior to forty-five degrees relates very closely with a blood alcohol concentration level of .10 grams percent. When Bentley administers the test, he looks for vertical nystagmus, which is prevalent as a result of a person’s use of prescription and/or illegal drugs.
Bentley testified his administration of the horizontal gaze nystagmus test to defendant indicated defendant had a blood Lalcohol concentration level of above .10 grams percent. On the test, defendant had poor tracking in each eye and a definite nystagmus at maximum deviation and prior to forty-five degrees.
Bentley testified the walk-and-turn test consists of taking nine steps forward walking heel to toe, turning, and walking back another nine steps in the same manner. On the walk-and-turn test, defendant was unable to stand while listening to Bentley’s instructions and “kept stepping off.” When ordered to begin the test, defendant took three normal steps but never attempted to touch his heel to his toe; and on defendant’s third step defendant lost his balance and refused to continue the test. At no time did defendant ever tell Bentley he physically could not perform the walk-and-turn maneuvers because of injury or a handicap or that there was anything else that precluded him from performing the maneuvers.
Bentley testified that on the one-leg-stand test, a person should be able to stand on one foot for thirty seconds. On this test, defendant did “very poorly” and gave Bentley no reason why he could not perform better on the test.
Bentley further detected a very strong odor of alcoholic beverage on defendant’s breath. Additionally, defendant’s speech was slurred, and defendant did not indicate he had a speech impediment. Nor did Bentley notice any such impediment.
At no time while Bentley was observing defendant or administering the field sobriety tests did defendant give Bentley any *995 indication or reason to think defendant was on any kind of prescription medication or illegal drugs. In sum, based on Bentley’s observations of defendant, defendant’s driving prior to the stop, obvious trouble following instructions, speech, poor performance on the field sobriety tests and the |Bstrong odor of alcohol, Bentley concluded defendant was extremely intoxicated.
Bentley placed defendant under arrest and transported defendant to the Donald-sonville jail. At the jail, Bentley read defendant the rights relating to a chemical test, including the consequences of refusal to submit to the test and the option available to defendant to submit to additional testing at defendant’s expense. Bentley also informed defendant of his constitutional rights. When Bentley offered the breathalyzer (Intoxilyzer 5,000) test to defendant at the jail, defendant refused to take the test. In refusing, defendant stated: “We both know that I — I couldn’t pass it. I’d be a fool to take the test.” Thereafter, defendant said: “I’m not answering any questions.”
Defendant took the witness stand at trial and testified in his own defense as follows. Defendant had back surgeries in October 1989 and February 1991. On May 7, 1996, defendant was admitted to a hospital emergency room for his back problems and was given a prescription for Soma for his back pain. On November 4, 1996, Dr. Streb gave defendant a shot and prescribed three medications (an antibiotic, an antihistamine, and a cough syrup containing codeine) for bronchitis.
On the day Bentley stopped him, defendant was taking the antihistamine and the cough syrup; and he had taken one Soma tablet earlier that day at about between 3:00 and 3:30 p.m. Defendant had gotten up for work at about 5:00 a.m. and had worked a ten-hour day. When defendant left work at about 5:45 p.m., he went home. Thereafter, he took Liz Mixon to Sedgie’s. Later, at 10:00 p.m. he picked her up, and the two left for home only to be stopped by Bentley along the way home. Defendant was |finot drinking any alcohol on the day he was stopped, and he had not consumed any alcohol for a couple of weeks preceding the stop. All he had to drink on the day of the stop was two O’Douls, which are non-alcoholic beers. At the time of the stop, defendant was extremely tired.
Defendant testified he has pain in his back, leg, ankle, and foot on a regular basis. When he walks, he sometimes sways and “rock[s] from side to side” due to the pain in his back and leg. Since his first back surgery, he has been unable to walk heel to toe or stand on one foot for thirty seconds without losing his balance.
Defendant testified that, when Bentley told him he would have to do the field sobriety tests, he told Bentley he could not do the tests, because he had had two back surgeries, had recently gone to the hospital emergency room for his back, and his leg was hurting. Nevertheless, Bentley told him to try to do the tests. When Bentley asked defendant if defendant had been drinking, defendant said “a couple;” but before defendant could say O’Douls the officer “cut [him] short.” Defendant further testified that although an O’Douls contains no alcohol it smells like beer.
Defendant testified he does not carry a wallet, because it would cause him hip pain if he did. When Bentley asked him for his wallet, defendant asked Mixon to give him the wallet, which was in the glove compartment of his vehicle.
Defendant acknowledged Bentley read him the consequences of refusing to take the breathalyzer test but stated he did not recall being told he had an option of taking an additional chemical test. Defendant recalled his refusal to take the test, but he stated he does not trust the reliability of the test. He |7finds a blood test is more reliable and would have submitted to a blood test if one had been offered. Defendant acknowledged his fear of the unreliability of the breathalyzer was partially related to his two prior DWIs, because in *996 1992 he was stopped after drinking only two beers and failed the breathalyzer even though he was not drunk. Regarding the meaning of “drunk”, defendant stated: “When you talk about people being drunk, you’re talking about stumbling drunk, running off the road into the ditch.”
Defendant denied his vehicle was weaving on the roadway prior to the stop. According to defendant, his vehicle crossed the centerline once before his vehicle was pulled over when he and Mixon were “shooting the bull.” Defendant also denied he ever told Bentley there was no use in him taking the breathalyzer test because he could not pass it.
Defense witness Liz Mixon testified defendant lives at her home and the two of them had been living together off and on for about ten years. She stated that she can tell when defendant has been drinking and when he is under the influence of alcohol. She stated that defendant was not under the influence of alcohol when he came home from work on November 14, 1996 and that on that day he was suffering from bronchitis and a cold. She further stated that defendant had had two back surgeries, and that defendant suffers with back trouble “[fjairly often.”
According to Mixon, she bought defendant an O’Douls when he picked her up at Sedgie’s. She stated that she thinks she would have known if defendant had been drinking anything other than O’Douls, and to her knowledge defendant was not drinking alcohol that night. However, defendant was taking prescription medication, a cough syrup, a muscle relaxer and either a I «decongestant or an antihistamine. Defendant was also tired. She corroborated defendant’s testimony that he does not carry a wallet in his pocket and stated that defendant did not have an alcohol or drug problem in November 1996.
On cross-examination, Mixon admitted that prior to the date in question she had seen defendant drink too much and lose his balance. She also stated that she considers losing one’s balance to be swaying and that she had seen defendant have to grab a rail to get upstairs after defendant had been drinking.
Defense witness Lisa Gautreau testified that she recalled the night defendant’s vehicle was pulled over by the police. Gau-treau was at Sedgie’s that night when defendant picked up Mixon and saw Mixon buy defendant what Gautreau thought was an O’Douls. When she spoke to defendant that night, she did not notice him having slurred speech or being off-balance.
Defense witness Dr. Charles R. Tessier, III, qualified and was accepted by the trial court as an expert in the field of general medicine and family practice. Dr. Tessier testified that on the day of his trial testimony he had had an opportunity to speak briefly with defendant, take a brief history from defendant, and make a brief physical examination of defendant at the courthouse. Dr. Tessier stated he looked at the scars on defendant’s back and is familiar with low back injury such as defendant has. According to Dr. Tessier, defendant seems to have neurological changes with respect to his equilibrium and defendant’s gait seems abnormal. Dr. Tessier stated that when he observed defendant walking, defendant’s walking was “rather shaky,” and defendant had to “kind of help position himself with the rail” on the side of the room. Consistent with the condition defendant has, it would be difficult for defendant to |8stand on one leg for periods of thirty seconds. Indeed, according to Dr. Tessier, defendant was unable to do the one leg stand for the doctor without stabilizing himself by holding onto something; and when defendant attempted to walk heel to toe, he was able to do it but only for a short distance before he started “wobbling” and had to get some assistance. In the doctor’s opinion, defendant was not malingering.
Dr. Tessier further testified that he observed defendant has a pterygium in his left eye. A pterygium can make the eye red, and defendant’s eye was slightly red. *997 Additionally, the doctor stated that he has prescribed Soma and that Soma is a central nervous system drug having similar properties to alcohol that would affect nys-tagmus.
On rebuttal, Trooper Bentley testified that defendant never asked him for a blood test. Nor did defendant ever tell Bentley he had a back problem when Bentley was administering the field sobriety tests. Bentley affirmed his earlier testimony given during the State’s case-in-chief regarding the statements Bentley attributed to defendant. Additionally, Bentley testified that his conclusion that on the night in question defendant was under the influence of alcoholic beverages was based on the totality of the circumstances, i.e., his presence with defendant, defendant’s demeanor and driving, the very strong odor of- alcoholic beverage on defendant’s breath, defendant’s poor balance and slurred speech, and defendant’s performance on the sobriety tests.

ASSIGNMENT OF ERROR

In his sole assignment of error, defendant contends that the evidence was insufficient to uphold the instant conviction.
In reviewing claims challenging the sufficiency of the evidence, this Court must consider “whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.” Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original). See also La.Code Crim. P. art. 821(B); State v. Mussall, 523 So.2d 1305, 1308-09 (La.1988).
When circumstantial evidence is used to prove the commission of the offense, La. R.S. 15:438 mandates that, “assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence.” This statutory test is not a purely separate one from the Jackson constitutional sufficiency standard. Ultimately, all evidence, both direct and circumstantial, must be sufficient under Jackson to satisfy a rational juror that the defendant is guilty beyond a reasonable doubt. Due process requires no greater burden. State v. Rosiere, 488 So.2d 965, 968 (La.1986).
In order to convict an accused of driving while intoxicated, the State need only prove that the defendant was operating a vehicle and that he was under the influence of alcohol or drugs.[2] State v. Graves, 95-0578, p. 7 (La.App. 1 Cir. 5/10/96), 675 So.2d 1141, 1145. Regarding the instant charge, there is no dispute that defendant was operating a vehicle, and defendant stipulated that he had been convicted of the two predicate DWI offenses used by the State to enhance the instant DWI to a third In offense.[3] Thus, we are only concerned with whether the state proved defendant was under the influence of alcohol.
Intoxication with its attendant behavioral manifestations, is an observable condition about which a witness may testify. What behavioral manifestations are sufficient to support a charge of driving while intoxicated must be determined on a case by case basis. Some behavioral manifestations, independent of any scientific test, are sufficient to support a charge of driving while intoxicated. State v. Hendon, 94-0516, p. 5 (La.App. 1 Cir. 4/7/95), 654 So.2d 447, 449. Herein, the evidence of defendant’s intoxication consisted of Trooper Bentley’s observations of defendant’s erratic driving and, after the traffic stop, Bentley’s observations of defendant’s physical condition, speech, and behavioral *998 manifestations, defendant’s performance on the field sobriety tests, defendant’s statement to Bentley that he had consumed four or five beers, defendant’s refusal to take the breathalyzer test and defendant’s statement to Bentley that both of them knew he could not pass the breathalyzer test and he would be a fool to take the test.
The trier of fact was free to accept or reject, in whole or in part, the testimony of any witness. State v. Gordon, 582 So.2d 285, 292 (La.App. 1 Cir. 1991). The jury’s verdict indicates that, after considering the credibility of the witnesses and weighing the evidence, the jury accepted the testimony of Trooper Bentley and rejected the testimony of defendant and his witnesses through which defendant hypothesized that at the time of the traffic stop he had not been drinking and was not intoxicated. The credibility of the witnesses’ testimony is a matter of weight of the evidence. The | ^determination of the weight to be given evidence is a question of fact for the trier of fact not subject to appellate review. State v. Tate, 506 So.2d 546, 551 (La.App. 1 Cir.), writ denied, 511 So.2d 1152 (1987). When a case involves circumstantial evidence, and the trier of fact reasonably rejects the hypothesis of innocence presented by the defendant’s own testimony, that hypothesis falls, and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt. State v. Hendon, 94-0516 at 6, 654 So.2d at 450. The only remaining reasonable hypothesis was that defendant was intoxicated while operating his vehicle. Accordingly, our review of the evidence under the Jackson standard convinces us that the evidence was sufficient to allow any rational trier of fact to conclude beyond a reasonable doubt and to the exclusion of any reasonable hypothesis of innocence that defendant was guilty of third offense DWI.
This assignment lacks merit.
CONVICTION AND SENTENCE AFFIRMED.

. In the instant case, the prosecution was based on defendant having been under the influence of alcohol and not drugs.

. These predicates were first offense DWI convictions in Ascension Parish on May 20, 1987, and October 30, 1992.