504 So.2d 72 (1987)
STATE of Louisiana, Appellee,
v.
Bedford Doyle RUFF, Appellant.
No. 18355-KA.
Court of Appeal of Louisiana, Second Circuit.
February 25, 1987.
Rehearing Denied March 25, 1987.
Writs Denied June 12, 1987.
*73 Gravel & Brady by Helen Ginger Roberts, Baton Rouge, for appellant.
William J. Guste, Jr., Atty. Gen., William R. Coenen, Dist. Atty., Terry A. Doughty, Asst. Dist. Atty., Rayville, for appellee.
Before MARVIN, SEXTON and NORRIS, JJ.
NORRIS, Judge.
The defendant, Bedford Doyle Ruff, was charged by indictment with second degree murder, LSA-R.S. 14:30.1, for the shooting death of W.O. "Posey" Adams. He urged self-defense, LSA-R.S. 14:20, and requested discovery of evidence that would support his claim. The state sought and received ex parte an order sealing a civil deposition which allegedly contained evidence favorable to the defense. The deposition was neither produced nor submitted to the judge for an in camera inspection in compliance with the discovery request, despite repeated requests. The defendant waived a jury and elected a bench trial in which extensive evidence was adduced. The trial judge concluded that the state had proved every element of the offense and had disproved self-defense. He found Ruff guilty and sentenced him to life in prison without benefit of parole, probation or suspension of sentence. After trial, he ordered the civil depositions unsealed.
Ruff now appeals, urging three assignments of error:
(1) Whether the state disproved, beyond a reasonable doubt, that the defendant did not act in self-defense in the shooting death of the deceased.
(2) Whether the trial court could reasonably find, under the appropriate legal standard, that the mitigating factors of manslaughter, "heat of blood" or "sudden passion," were not present when the defendant shot the deceased.
(3) Whether the state improperly withheld exculpatory, material evidence which would have had a reasonable probability of changing the outcome of the case.
We find that the second and third assignments of error have merit and mandate reversal. Because of the odd interplay of legal rules that these assignments present, we are required to remand with special instructions for a new trial on manslaughter.

FACTS
Although the mortal confrontation between Doyle Ruff and his victim was brief, it came at the end of a long sequence of facts that must be treated as a background. For our statement of these facts we rely heavily on the factual findings of the trial judge,[1] noting the discrepancies of testimony where applicable, and treating *74 the evidence in light most favorable to the prosecution. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).
For several months before New Years Eve 1984, Doyle Ruff had begun to feel his health and his fortunes decline. For one thing, he had begun seeing spots in his peripheral vision. His physician warned him that he was in danger of detaching his retina. This would have been devastating to the 56-year old Doyle, who was a commercial pilot and crop duster by trade. The doctor advised him to avoid heavy jolts and bumps since they could provide the force necessary to detach the retina and snuff out his sight.
More depressing, however, was the steady deterioration of Doyle's marriage. He and his wife, Glenda, had lived together for several years even though they were not married until May 1984. They lived in Girard, near Rayville. They began having disagreements, which Glenda attributed to jealousy. Because of these difficulties they separated at Thanksgiving 1984, with Glenda going to live with her sister and brother-in-law, Diane and Buddy Smith. Fearing she had left for good, Doyle contemplated suicide and wrote a will. Shortly afterward, Doyle heard that Glenda had been seen dancing with and kissing Posey Adams. Doyle confronted her with this information but she denied it. The following Saturday he saw Glenda and Posey talking at the Magnolia Lounge. He left; when he returned an hour later, he was told that she and Posey had left together. He was also told that Glenda and Posey had been seen dancing together at a bar in Tendal. Doyle was jealous of this relationship but denied any ill feelings toward Posey, whom he knew personally and as a brother at the Rayville Moose Lodge. He blamed it all on Glenda.
Doyle tried to win Glenda back. When he learned that Glenda's children from a prior marriage would be coming home for the holidays, he invited them to come stay with him so they could all be together. Glenda accepted, and on December 30 she and the children came to his home. They stayed together that day and night but Glenda did not intend it as a reconciliation.
The following day, New Years Eve, was the annual party and dance at the Moose Lodge. Glenda was to work there as bartender that afternoon and night. Doyle did not plan to attend. Instead, he spent most of the day visiting with various friends around Rayville. He had a fair amount to drink. In mid-afternoon he stopped by the Moose Lodge, had a drink and chatted with Glenda; he complimented her appearance and their conversation was friendly. He left around 4 p.m. to visit with other people.
Sometime after 5 p.m., he went to his brother-in-law Woody Graham's house. There he watched some football, ate and drank. By 10 p.m. he told Woody he was ready to go home. Woody prevailed on him and persuaded him to meet him at the Moose Lodge party. Doyle went home, changed clothes and returned to the Moose Lodge at 10:30. He parked on the driveway on the west side of the lodge, not far from the kitchen door through which he entered to go to the bar area. He took a seat on a stool on the west side of the bar. He sat there for about an hour, talking with his friends, Terry and Ramona Haire, and some other people. He was described as being quieter than usual, though he acted normally and ordered two or three drinks. The trial judge found that Doyle was not armed as he sat in the bar talking to his friends. The judge felt that Doyle was in a melancholy mood, contemplating the loss of Glenda. Posey was also at the party, mostly in the ballroom area of the lodge; he passed through to the bar a few times for drinks and exchanged acknowledgments with Doyle. There were no hostilities between the two, nor between Doyle and Glenda.
By 11:30, the other people in the bar had left. Glenda told the band that the bar was closing. At about 11:45, she said to Doyle, "Mr. Ruff, I'm closing the bar." Doyle got up and walked to the foyer, where Vern and Polly Leach were. On the way, he passed by Posey, who walked into the bar and closed the door behind him. Doyle *75 waited near the ballroom door for two or three minutes. He testified he thought the bar was closed and could not understand why Posey could go in while he could not. Doyle therefore went back into the bar area and saw Glenda and Posey talking. Glenda testified she was mixing Posey a drink. She firmly told Doyle to leave and go home. The trial judge felt that this rebuke only added to Doyle's growing humiliation and anger. He was irked when Glenda chose to let Posey remain and ordered him to leave. He tossed his drink in Glenda's face. Posey, raising his voice, cursed Doyle and told him he was crazy. Doyle turned to Posey and told him in strong terms to leave his wife alone. Posey angrily denied the accusation and told Doyle he was tired of being accused. They began to scuffle; according to Doyle, Posey threw the first punch. Posey was a muscular man of 215 pounds who stood at 5' 10"; Doyle was much smaller, weighing only 130 pounds and standing 5' 7½". Because she was momentarily blinded by the liquid in her eyes, Glenda could not see the fight, but she could hear barstools being knocked over. By the time her eyes cleared, she saw them standing by the door. Posey told Doyle to meet him out back; he left through the kitchen door. Doyle hurried through the foyer and out the front door, slamming the doors behind him. Glenda rushed through after him, stopped in the foyer and told Vern and Polly Leach that she was afraid Doyle was going after a gun.
Doyle's truck was parked on the west side of the lodge, about 50 feet from the kitchen door through which Posey was exiting. Doyle reached his truck and started to open the door. The trial judge found that as he was attempting to open it, Posey emerged from the kitchen door and yelled at Doyle, "Wait a minute, we are going to get this [matter] straight." He came at Doyle "fairly rapidly." Doyle opened his truck door and said, "Get back, Posey." Posey only kept coming and hollered, "Wait a minute, * * *, we are going to get this [matter] straight." Doyle was not armed at this time but he had a fiveshot.38 pistol in his door pocket. When he felt Posey was getting too close, he took the pistol and fired a "warning" shot toward the ground. The trial judge found that his first shot struck Posey in the upper right leg. According to Doyle, Posey did not stop but rather charged at him faster. Doyle then fired two more shots. One of them went through Posey's right forearm, which must have been raised, penetrated the rear deltoid muscle, re-entered the body, cut a major artery and struck the left rib cage. The trial judge found that this, the second shot, spun Posey completely around to his left and made him slump over. The third shot hit him in the back, starting in the lower right and going in at an angle. The trial judge found that after the third shot, Posey fell down. He was about 20 or 30 feet from Doyle's truck, according to an admittedly "rough" estimate that the trial judge accepted.
After firing the shots, Doyle walked back to the front door of the lodge. At some point he had clipped the holster to his belt, replaced the pistol in the holster and covered it with his coat. When he came back to the bar area, Vern Leach noticed the pistol and recalled Glenda's warning moments earlier; he asked him to surrender the pistol. Doyle would not give it up, and a struggle ensued. Another lodge member, Donald Hutto, came up to help Vern; they subdued Doyle. Several witnesses testified that Doyle was in a rage, or hysterically crazy, and kept repeating, "I shot Posey." The trial judge found that Doyle had re-entered the bar not to shoot Glenda, as the state argued, but to tell her what he had done and thereby hurt her emotionally. Doyle testified that he re-entered the lodge to tell Glenda to call for help.
The police arrived immediately and took Doyle into custody. For the first few minutes, he kept asking for a gun to "finish the job" and he seemed to want to kill himself. Posey Adams was lying on the gravel driveway next to a parked truck. There was no weapon on or around him. An ambulance arrived; the technicians found that he had a weak pulse so he was carried to the Richland Parish Hospital *76 where he was given extensive transfusions in the effort to save him. He died several minutes later from acute blood loss caused by gunshot wounds. His blood alcohol level, even after the transfusions, was .07.
The trial judge found that Doyle was already at his truck when Posey came out the back door. Doyle had time to open the door, take out the pistol and see Posey coming at him very rapidly. The judge discussed these findings in terms of self-defense. There is no general duty of retreat but retreat is a factor bearing on the reasonableness of a defendant's belief that he had to use deadly force to protect himself. LSA-R.S. 14:20, Reporter's Comment (1); State v. Bailey, 261 La. 831, 261 So.2d 583 (1972). The trial judge felt that since Doyle had enough time to open the truck door, reach for the pistol, take it out of its holster and fire three shots while the victim was still 20 or 30 feet away, then he certainly had enough time to have got into the truck, locked the doors and left.

ASSIGNMENT NO. 1
By his first and principal assignment of error, Ruff contends that the state's evidence was insufficient to establish that the killing was not committed in self-defense. In reviewing a claim of insufficient evidence, we follow the standard announced by the U.S. Supreme Court in Jackson v. Virginia, supra; see also LSA-C.Cr.P. art. 821. Accordingly, we will resolve any conflict of evidence in light most favorable to the state and determine whether the facts established by the direct evidence and inferred from the circumstantial evidence are sufficient for a rational factfinder to conclude beyond a reasonable doubt that the homicide was not perpetrated in self-defense. State v. Captville, 448 So.2d 676 (La.1984); State v. Harris, 480 So.2d 281 (La.1985); State v. Lynch, 436 So.2d 567 (La.1983). For indeed the state must prove, in order for the conviction to stand, that the killing was not perpetrated in selfdefense, beyond a reasonable doubt. State v. Brown, 414 So.2d 726 (La.1982). The standard of self-defense is codified in LSA-R.S. 14:20(1), which provides:
A homicide is justifiable: (1) When committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger * * *.
We have carefully considered all the evidence in the record. First and foremost, it is not contested that Ruff killed Posey Adams. The defendant admits that he pointed his gun in the victim's direction and fired three shots, two of which were with the specific intent to kill or inflict great bodily harm. Posey Adams fell to the ground and later died from acute blood loss resulting from the gunshot wounds. R.p. 725. Thus the elements of the homicide are not at issue.
The sufficiency of the state's evidence negating self-defense beyond a reasonable doubt is a close question but after careful review we conclude that this evidence was sufficient. The state showed that Ruff and his victim exchanged heated words and scuffled in the bar.[2] Ruff stormed out of the bar scared and angry, slamming the doors behind him. He went to his truck and, before he could get in, he saw his victim coming out of the nearby kitchen door. The two exchanged words again while Posey advanced towards Ruff. Instead of climbing into the safety of his truck, locking the doors and driving away, he grabbed a loaded gun and fired it three times at Posey. Posey's body was found at a distance estimated at 20 or 30 feet from Ruff's truck. The trial judge personally visited the scene and undoubtedly felt that given the terrain and the circumstances, this distance was great enough to allow Ruff the time to get into his truck and escape.
On appeal, Ruff has cited the various factors that led him to fear a second encounter with Posey Adams. These included Ruff's concern that a buffet or blow might detach his retina; the accusations of Posey's involvement with Glenda; the previous *77 scuffle; Posey's challenge for Ruff to meet him out back and settle their differences; Posey's menacing advance; and the fact that Posey was several inches taller and about 85 pounds heavier than Ruff. Mostly, however, he urges that the trial judge erred in finding that Posey was 20 or 30 feet away when the fatal shots were fired.
The distance naturally bears on the ability to escape. Louisiana does not impose an unqualified duty to retreat. The possibility of escape is a recognized factor in determining whether the defendant had a reasonable belief that deadly force was necessary to avoid the danger. State v. Bailey, supra; State v. Brown, supra; LSA-R.S. 14:20, Reporter's Comment. However, given the relative sizes of the parties, cf. State v. Dill, 461 So.2d 1130 (La.App. 5th Cir.1984), the distance between them, the quickness in which the situation developed, the trier of fact was convinced that retreat was the most reasonable alternative for Ruff to avoid the danger.
Ruff testified that when he fired, Posey was "getting pretty close," "right in front" of him and "coming at" him. R.p.p. 568, 569. He could not give a distance in feet. R.p. 569. The trial judge was certainly entitled to look at his testimony about the distance as self-serving. There was no other evidence offered to corroborate Ruff's version of events except the testimony of Dr. McCormick, the Bossier Parish coroner and defense witness; he felt that the physical evidence did not exclude the reasonable possibility that Posey could have walked or staggered some distance before he fell and that traces of blood would be evident only at the place where he fell.
By contrast, the state offered the testimony of Officer Nicholson, who estimated the body was 20 to 30 feet from Ruff's truck, and Officer Eddie Joe Graham, who estimated it at 30 to 40 feet. The state also presented the testimony of Dr. Pankey, the pathologist who actually examined Posey's remains. He agreed that the angulation of the bullet in the thigh wound was consistent with the victim being shot at close range while he was lying on the ground. R.p. 402.
Viewing all this evidence in light most favorable to the state, we feel that a rational factfinder could have concluded beyond a reasonable doubt that Ruff was standing by the open door of his truck when he fired at Posey 20 to 30 feet away, that this distance shows that Ruff had adequate time to escape, and that Ruff did not have a reasonable belief that deadly force was necessary to avert the danger. This record, viewed in light most favorable to the state, is sufficient to prove beyond a reasonable doubt that Ruff did not act in self-defense. This assignment does not present reversible error.

ASSIGNMENT OF ERROR NO. 2
By this, his second sufficiency argument, Ruff claims the trial judge erred in failing to enter a judgment of acquittal as to second degree murder on the basis the evidence established the defendant was provoked to act in a "heat of blood" or "sudden passion," justifying only a verdict of manslaughter. Manslaughter is defined as:
A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed * * *. LSA-R.S. 14:31(1) (emphasis added).
The jurisprudence has discussed the tenuous distinction between manslaughter and self-defense. It sometimes refers to manslaughter as the "imperfect" defense. The rationale is that murder and manslaughter are in fact the same criminal act but that passion reduces the former to the latter; lack of passion elevates manslaughter *78 to murder. "Sudden passion" or "heat of blood" immediately caused by provocation sufficient to deprive an average person of his self control and cool reflection are not elements of manslaughter. Rather, they are mitigatory factors in the nature of a defense and serve to exhibit a degree of culpability less than that present when homicide is committed without them. State v. Lombard, 486 So.2d 106 (La. 1986); State v. Tompkins, 403 So.2d 644 (La. 1981). Therefore a defendant who establishes by a preponderance of the evidence that he acted in a "sudden passion" or "heat of blood" is entitled to a manslaughter verdict. Where such proof is sufficient, a second degree murder verdict is inappropriate.
We have therefore asked, in reviewing this claim, whether a rational trier of fact, viewing the evidence in light most favorable to the prosecution, could have found the mitigatory factors were not established by a preponderance of the evidence. State v. Bryan, 454 So.2d 1297 (La.App. 3d Cir. 1984), writ denied, 458 So.2d 128 (La. 1984); State v. Lombard, supra.
The trial judge found that on the night of the shooting, Ruff was upset about Glenda leaving. When she let Posey stay in the bar after it was supposed to be closed, Ruff got angry at her. The confrontation in the bar added to his humiliation and anger. We think that the acts of throwing the drink into Glenda's face and then responding to Posey's verbal assault by shouting at him show that Ruff was quickly losing his grip. The senseless struggle with a man so much larger was enough to shatter any remnant of self-control and cool reflection. When Ruff stormed out of the bar, slamming the doors behind him, he was scared and angry. He quickly reached his parked truck and was perhaps on the verge of cooling off when he was suddenly confronted again with Posey's provocation. Not only did Posey distract him from his possible escape by hollering at him to wait, but Posey advanced on him as though to fulfill the threat he had issued inside the bar only moments earlier. Terrified at the prospect of getting a serious whipping at best, and perhaps flushed with the thought that the gun would equalize their physical inequalities, Ruff grabbed his pistol and fired. The trial judge found that when Ruff returned to the bar, he was still in a rage, hysterical or crazy. He imprudently refused to hand over the gun; if he had been in possession of cool reason, he would have done so and avoided the rough physical encounter that ensued and imperiled his eyesight. Instead, he allowed himself to be wrestled down; afterwards, he kept talking about suicide.
In essence, this evidence preponderates that immediately before and immediately after the shooting, Ruff was consumed by sudden passion and deprived of cool reflection. The combination of the health problems, the marital problems, the spurning by his wife in favor of someone else, the futile scuffle in the bar and the challenge to settle matters out back were enough to affect the "average person" in this way. The trial judge also found that the shooting itself was attended with Posey's "fairly rapid" advance; according to Ruff, Posey's intent was clear. Thus not only before and after, but at the very instant of the shooting, Ruff was deprived of cool reflection and self-control by provocation that would have affected the average person the same way.[3]
Viewed in light most favorable to the prosecution, the evidence preponderates to show that Ruff committed the offense in a sudden passion or heat of blood immediately caused by provocation which would have deprived an average person of his self control and cool reflection. No rational trier of fact could have concluded otherwise. The trial judge therefore erred in not finding that Ruff was guilty of nothing more than manslaughter on the facts presented. This error is reversible in terms that we will discuss under the subject of relief.

*79 ASSIGNMENT OF ERROR NO. 3
By his third assignment, Ruff claims the trial judge erred in refusing to unseal, prior to trial, civil depositions which related to the facts of this case and contained exculpatory evidence material to the defense. Ruff argues that the refusal to unseal the depositions amounted to allowing the state to withhold evidence that would have had a reasonable probability of changing the outcome of the case.
The request for discovery was based on the holding in Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The suppression by the prosecution of evidence favorable to an accused, upon request, violates due process where the evidence is material to either guilt or punishment. The Brady rule is based on the requirement of due process. Its purpose is not to displace the adversary system as the primary means by which truth is uncovered, but to assure that a miscarriage of justice does not occur. Thus the prosecutor is not required to deliver his entire file to defense counsel, but only to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial. United States v. Agurs, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). Evidence favorable to the defendant includes both exculpatory and impeachment evidence. Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). The test for determining materiality was firmly established in United States v. Bagley, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome. Louisiana has followed Bagley. See State v. Rosiere, 488 So.2d 965 (La. 1986).
The history of the sealed depositions is long and detailed but essential to the resolution of this issue. On the night of the shooting, Rayville police officers Eddie Joe Graham and Tommie Alexander were conducting a routine patrol around the Moose Lodge. According to their trial testimony, they were driving north on Eugene Street and approached the lodge on their right. They heard three shots and first thought it was an early New Years celebration. Seconds later, they turned their glance to the right and could see two men. Officer Alexander testified that he saw one man falling and one man walking away. These were later identified as Posey Adams and Doyle Ruff. Sergeant Graham, who was driving the patrol car, did not testify where he saw Posey Adams falling, but said that Posey fell 30 or 40 feet from Ruff's truck.
As a result of Posey Adams' death, a civil suit was filed against Ruff and several other parties. In October 1985, five months before the criminal trial took place, several of the key witnesses were deposed in the civil suit. Two days before the depositions were taken, the District Attorney filed a Petition of Intervention and Motion for Protective Order, claiming the criminal case would be severely prejudiced if the depositions were taken and divulged. Defense counsel was not served with this motion; the defense was unaware that the depositions were scheduled and unaware of the District Attorney's position. In accord with the District Attorney's request, the court forbade any attorneys or representatives of the defendant from attending the depositions and forbade anyone who attended from disclosing to defendant or defense attorneys what was said. The court ordered the depositions sealed. The court also ordered that only a court reporter and attorneys for the other parties be present, but an Assistant District Attorney did in fact attend the depositions.
The defense learned of the existence of the sealed depositions about one week before trial. It immediately moved to unseal them and to discover any favorable evidence they might contain, especially the deposition of Sgt. Graham, who had refused to be interviewed about the case. The court denied the motion. The depositions were unsealed only after the trial and sentencing; Sgt. Graham's deposition was placed in the appellate record.
*80 Sgt. Graham's deposition differed markedly from his trial testimony. In deposition he was asked how far apart the body and Ruff's truck were. He replied, "a little more than one car length." Dep. 24. He elaborated that it "wasn't too much more than two car lengths if it was that much." Dep. 25. This would suggest a distance of ten to 20 feet, far shorter than the 30 to 40 foot estimate he gave at trial, R.p. 469. An even more crucial difference involved exactly what Sgt. Graham saw when he first looked out the window of his patrol car. In deposition, he said:
A few seconds later, after we got there, we seen this guy, you know, staggering across the yard and fell, and we seen another one walking off.
Dep. 8. Sgt. Graham denied that the victim "fell like a tree":
He was walking and staggering, and when he started falling, he hit the front end of a truck which was in front of him.
Dep. 9-10. Contrast this with the trial testimony in which he claimed that his partner, Officer Alexander, was the one who saw the fall. Sgt. Graham admitted only to seeing the other person, Ruff, walk away. R.p. 456.
It is almost elementary to conclude that this evidence was material. As we noted in the discussion of the first assignment of error, the distance between Ruff and his victim was crucial to the possibility of retreat, and retreat was crucial to the issue of self-defense. The evidence consisted of rough estimates from Officers Graham, Alexander and Nicholson, who guessed not where Posey was shot but where he finally fell; and some equivocal forensic testimony from Dr. Pankey. The defense evidence consisted only of Ruff's own assertion that Posey was closer when he fired the gun, and some possibly corroborative testimony from Dr. McCormick, who never examined the body or the scene. We held that the trial judge, given this balance of evidence, ruled correctly on the issue of self-defense.
The new evidence from Sgt. Graham's deposition gives us grave doubts about the correctness of this ruling. If indeed Sgt. Graham saw Posey "staggering across the yard," then this corroborates Ruff's testimony that his attacker was very near when he shot. It also corroborates the defense theory that Posey Adams stumbled away in the opposite direction from Ruff after he was struck by the bullets; this additional evidence makes the defense story more believable and, coupled with Dr. McCormick's testimony, substantially upsets the balance of evidence on which the trial judge based his decision below. Indeed, Sgt. Graham's deposition clearly indicates that Posey Adams was still on his feet after the three shots were heard, and that he did not fall down until he ran into a parked truck. Moreover, Sgt. Graham's estimate in deposition of where the body lay was substantially at variance with the trial estimate of Officer Nicholson, on whom the trial judge obviously relied. At the very least, the deposition evidence offsets the outside limit of 40 feet that was offered at trial; we are constrained to say that if this evidence had been before the trial judge, there is at least a reasonable probability that the result would have been different. See State v. Rosiere, supra. We think the defense should have been able to ask Sgt. Graham which version of the story was more accurate, and perhaps to show that the deposition given much closer in time to the incident was indeed correct. See State v. Bailey, supra.
We therefore hold that if this deposition evidence had been disclosed to the defense, there is a reasonable probability that the result of the proceeding would have been different. The probability is enough to undermine our confidence in the outcome of this case. United States v. Bagley, supra; State v. Rosiere, supra.
In defense of its decision to seal the depositions, the state has tendered a lengthy argument about the proper function of discovery in a criminal trial. The state correctly asserts that the Code of Criminal Procedure does not allow the deposing of state witnesses. This is because, according to the state, the defendant might fabricate an exculpatory story from the depositions, and then advance it with impunity *81 since he need not testify in his defense.
We feel, however, that this argument has little relation to the circumstances of this case. In the first place, this record does not establish to our satisfaction that there was compliance with the civil requirements for a protective order. We do not find a service of citation on all the other parties as required by LSA-C.C.P. art. 1093; we also do not understand how the protective order was issued without a contradictory hearing. LSA-C.C.P. arts. 1426, 963.
Even assuming that the procedure for securing the protective order was proper, the requirements of the order were not observed by the state. Contrary to the provision that no one except the parties' attorneys should attend the deposition, an Assistant District Attorney was present. R.p. 181. This Assistant District Attorney not only attended but participated in Sgt. Graham's deposition by advising him of his right to waive signing. Dep. 4. This shows an unhealthy lack of concern for the terms of the protective order whereby the state felt free to disregard them.
We also note the trial judge's observation at the pretrial hearing to unseal the depositions that if the deposition turned up anything favorable to the defense, then the state would be obligated to disclose it. R.p. 182-183. In other words, the trial judge thought that the obligation of disclosure under Brady would outweigh the alleged need for secrecy in the deposition. This is correct. Other "secret" information routinely yields to Brady requests. For example, juvenile records are strictly confidential, LSA-C.J.P. art. 122, but are liable to production if they contain information beneficial to the defendant. Davis v. Alaska, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974); State v. Toledano, 391 So.2d 817 (La.1980). Grand jury proceedings are also confidential, LSA-C.Cr.P. art. 434, but are subject to in camera inspection to determine their materiality. State v. Ford, 375 So.2d 641 (La.1979). Privileged DHHR reports that are otherwise confidential, LSA-R.S. 46:56 A, are nevertheless subject to discovery. State in the interest of Delcuze, 407 So.2d 707 (La.1981). In sum, the due process requirement of Brady is important enough that it can be presumed to take precedence over a protective order unless the party seeking the order can make a definite showing of need and irreparable harm. An adequate showing has not been made in this case.
The state also asserts that the defense had full access to all the police officers for cross-examination in pretrial proceedings. This is not correct. Sgt. Graham did not testify pretrial; Tommie Alexander did, but the issue at that pretrial hearing was to suppress allegedly inculpatory statements made immediately after Ruff's arrest. Thus there was no real questioning about what the witnesses saw before Ruff was taken into custody, and this is the time frame that the necessary questioning about distance would have to address.
We therefore find that the state improperly withheld exculpatory, material evidence which would have had a reasonable probability of changing the outcome of the case. This is reversible error that mandates a new trial.

RELIEF
We finally turn to the issue of relief. This is complicated because of the unusual interplay of reversible errors that arise in this case. The remedy for a Brady violation is a remand for a new trial in which the withheld evidence may be presented. Additionally, the first trial did not produce enough evidence to sustain a conviction for second degree murder, but it did produce sufficient evidence to warrant a conviction for manslaughter. If sufficiency of evidence were the only issue, we would reverse and enter a conviction for the lesser included offense of manslaughter. We feel that to remand for a new trial under Brady without further instructions would significantly chill Ruff's appellate rights. See State v. Goodley, 423 So.2d 648 (La.1983). In light of the sufficiency argument, to retry Ruff for second degree murder would penalize him for having asserted his Brady claim. This result would be unacceptable.
*82 We are therefore required to reverse the conviction for second degree murder. While the evidence in this record will only justify a conviction for manslaughter, we do not enter a judgment or verdict to that effect because the defendant is entitled to a new trial as a result of the Brady violation. The new trial should be on a charge no greater than manslaughter. The case is therefore remanded for a new trial consistent with this opinion.
CONVICTION REVERSED; CASE REMANDED FOR NEW TRIAL WITH INSTRUCTIONS.
SEXTON, J., concurs in part and dissents in part with written reasons.
SEXTON, Judge, concurring in part and dissenting in part.
I wholeheartedly agree with the majority that manslaughter is the most severe offense this record will support and that Brady material was inappropriately suppressed.
However, I would go a step further and find on this record, viewing the evidence in the light most favorable to the prosecution, that the state did not disprove self-defense beyond a reasonable doubt.
Immediately prior to the shooting, the defendant had been in an altercation with a much larger man who had challenged him to go "outside." The defendant was at the door of his truck when the victim exited the building only some 40 feet away. The victim immediately challenged the defendant. The testimony of the defense pathologist, Dr. George McCormick, the Bossier Parish Coroner, is clear that the first shot which Doyle intended only as a warning struck the victim in the leg as he was running toward Doyle. The trial judge agreed with Dr. McCormick on this point.
Indeed, the trial judge accepted Dr. McCormick's theory of the shooting. Of particular note is Dr. McCormick's testimony that the victim was undoubtedly hit in the back by the third shot and propelled away from the defendant.
At trial Sgt. Graham's partner, Officer Alexander, testified that he heard the shots at a distance that can be safely estimated to have been one-third to one-half block before they drove by the Moose Lodge. He testified that a number of seconds later as they were passing the lodge he looked over his shoulder and saw the victim fall some ten feet from the defendant's position. It was not until after this point that Graham made his observations.
Therefore, it is impossible to credit the state's theory that the victim was shot after he was lying down. The record does not support it and the trial judge did not accept it. Superimposed on these considerations is that, as the majority points out, the defendant does not have an absolute duty to retreat.
In my view, the trial judge's determination that the state sustained its burden regarding self-defense is based on the court's determination that the victim fell where he was shot. The record evidence is to the contrary. Thus, in my view, the state has not discharged its burden of proving that the defendant did not act in selfdefense. I would discharge the defendant.
NOTES
[1] We are sensitive to the unusual posture of this case. In the ordinary criminal case, there is only a verdict with no findings of fact; therefore, the standard of "light most favorable to the prosecution" is applied. Here, however, the trial court made specific factual findings before he rendered the verdict, and we will nevertheless review them under the constitutional standard of Jackson v. Virginia, supra.
[2] The aggressor doctrine was not an issue in this case. R.p. 723; LSA-R.S. 14:21.
[3] We note that although the trial judge made extensive factual findings and offered a detailed discussion of how self-defense was disproved, he omitted any mention whatsoever of manslaughter and why he felt it was inapplicable to the case.