STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

KA 11-955


STATE OF LOUISIANA

VERSUS

BRYCE W. PERKINS



**********

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 29877-09
HONORABLE RONALD F. WARE, DISTRICT JUDGE

**********

**BILLY HOWARD EZELL**
**JUDGE**

**********

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Sylvia R. Cooks, and Billy Howard Ezell, Judges.


**REVERSED AND REMANDED FOR RESENTENCING WITH INSTRUCTIONS.**



**John Foster DeRosier**
**District Attorney**
**Carla Sue Sigler**
**Assistant District Attorney**
**P. O. Box 3206**
**Lake Charles, LA 70602-3206**
**(337) 437-3400**
**COUNSEL FOR PLAINTIFF/APPELLANT:**
    **State of Louisiana**

**Thomas L. Lorenzi**
**Lorenzi & Barnatt, LLP**
**518 Pujo Street**
**Lake Charles, LA 70601**
**(337) 436-8401**
**COUNSEL FOR DEFENDANT/APPELLEE:**
**Bryce W. Perkins**

**EZELL, Judge.**

Defendant, Bryce W. Perkins, was convicted by a jury of second degree murder after being indicted by a Calcasieu Parish Grand Jury. The trial court then granted Defendant's motion for post verdict judgment of acquittal, which requested a reduction to manslaughter, a violation of La.R.S. 14:31. Defendant then waived sentencing delays, and the court sentenced him to thirty years at hard labor, the first twenty without benefit of parole, probation, or suspension of sentence.

The State now appeals the trial court's ruling on the motion for post verdict judgment of acquittal, assigning a single error.

## FACTS

On the night of July 4, 2009, a large group of people in their late teens and early twenties gathered at a house in Lake Charles for a party. A fight broke out involving a young man named Taylor Johnson. After Johnson fell to the ground, various people began kicking him, and he assumed a fetal position. Some testimony indicated that the victim, Daniel Gueringer, and a young man named Devionte Edmonson intervened and stopped the fracas. Defendant, Johnson's friend, arrived and stood near the fallen man; he produced a pistol, raised it over his head, and chambered a round. Although there was conflicting testimony regarding which young men took what actions, some partygoers attempted to subdue Defendant. They were unsuccessful. Defendant leveled the pistol and fired a shot. The victim fell to the ground with a head wound and later died.

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we submit one error patent.

The record before this court does not indicate that the trial court advised Defendant of the prescriptive period for filing post conviction relief as required by La.Code Crim.P. art. 930.8. Thus, the trial court should be directed to inform Defendant of the provisions of Article 930.8 at resentencing.

## ASSIGNMENT OF ERROR

In its sole assignment of error, the State argues the trial court erred by reducing the jury's verdict of second degree murder to manslaughter. Further, the State contends the trial court used the wrong legal standard in its analysis of the motion. As the State observes, La.Code Crim.P. art. 821 explains:

> A. The defendant may move for a post verdict judgment of acquittal following the verdict. A motion for a post-verdict judgment of acquittal must be made and disposed of before sentence.
>
> B. A post verdict judgment of acquittal shall be granted only if the court finds that the evidence, viewed in a light most favorable to the state, does not reasonably permit a finding of guilty.
>
> C. If the court finds that the evidence, viewed in a light most favorable to the state, supports only a conviction of a lesser included responsive offense, the court, in lieu of granting a post verdict judgment of acquittal, may modify the verdict and render a judgment of conviction on the lesser included responsive offense.
>
> D. If a post verdict judgment of acquittal is granted or if a verdict is modified, the state may seek review by invoking the supervisory jurisdiction of or by appealing to the appropriate appellate court.
>
> E. If the appellate court finds that the evidence, viewed in a light most favorable to the state, supports only a conviction of a lesser included responsive offense, the court, in lieu of granting a post verdict judgment of acquittal, may modify the verdict and render a judgment of conviction on the lesser included responsive offense.

There are some cases indicating that review of a trial court's action denying a motion for acquittal is subject to an abuse of discretion standard. *See, e.g., State v. Sedlock*, 04-564 (La.App. 3 Cir. 9/29/04), 882 So.2d 1278, *writ denied*, 04-2710 (La. 2/25/05) 894 So.2d 1131. However, these cases apply this standard only to

motions for acquittal arising from *bench trials* under La.Code Crim.P. art. 778. *See, Id.* To the contrary, appellate review of such decisions arising from *jury trials* requires eliminate a standard review of the sufficiency of the trial evidence, as codified in La.Code Crim.P. art. 821. *State v. Coleman*, 09-106 (La.App. 3 Cir. 10/7/09), 20 So.3d 1163, *writ denied*, 09-2424 (La. 6/4/10), 38 So.3d 298; *State v. Savoy*, 08-716 (La.App. 3 Cir. 12/10/08), 999 So.2d 285, *writ denied*, 09-509 (La. 11/20/09), 25 So.3d 785.

The structure of sufficiency reviews is well-established:

When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979); *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibilities of the witnesses, and therefore the appellate court should not second-guess the credibility determinations of the trier of fact beyond the sufficiency evaluations under the *Jackson* standard of review. See *State ex rel. Graffagnino*, 436 So.2d 559, *citing State v. Richardson*, 425 So.2d 1228 (La.1983).

In order for the state to obtain a conviction, it must prove the elements of the crime beyond a reasonable doubt. The *Jackson* standard has been codified at La.Code Crim.P. art. 821 as the standard for post verdict judgments of acquittal.

*State v. Bolden*, 95-749, p. 10 (La.App. 3 Cir. 4/17/96), 680 So.2d 6, 13-14, *writ denied*, 96-1272 (La. 11/22/96), 683 So.2d 286.

As the State points out, a trial judge analyzing such a motion is not to re-weigh the evidence. *State v. Voorhies*, 590 So.2d 776 (La.App. 3 Cir. 1991).

At the hearing below, the trial judge explained:

When Mr. Perkins arrives on the scene, he does not have the gun. He gets up to the fracas. Then he tells Austin Rousseau to give him the gun which Rousseau does. Mr. Perkins yells "Get back." He's waving the gun around. There were [sic] some vulgar language

3

which was used, and it was just, I think, utterly clear that Mr. Perkins was very serious about trying to help his friend.

He now has the gun. He raises it over his head and he chambers a bullet. He racks the gun. The gun is still over his head. Jack Hart said that the gun was waving around or Mr. Perkins was waving the gun around, no aiming. And Mr. Cale Brouillette said the same thing, and others said the same thing too. The gun is still above his head.

While the gun is above his head, McCord, Justin or Judson. I have Justin in one place in my notes and Judson in another place. But Mr. McCord, while the gun is -- Mr. Perkins is holding the gun above his head, squares off and punches Bryce Perkins. Everybody said that. One or two witnesses said they didn't see that, but it's -- that's been established beyond a doubt, that McCord punched Perkins.

Perkins stumbled. One witness said that he thinks that his knee, one knee may have even hit the ground. And at that point, Pierce Johnson jumps on -- some said jumped on Bryce Perkins' back. Others said grabbed him by the shoulders from the back. And this was done in an attempt to subdue Bryce Perkins and avoid anything further from developing in terms of the gun firing or anything else escalating.

Mr. Johnson, Pierce Johnson was shaken off and lost his grip on Bryce Perkins. And then, Korey King grabbed the gun.

. . . .

**THE COURT:**

Excuse me one second. Okay. I'm looking at some of the notes of the testimony. Okay. Be that as it may, when Pierce Johnson tries to intervene, the gun is still up in the air, and that's his testimony. Gun still pointed in the air after it was racked (reading).

And after he lost control or was shaken from Bryce Perkins, it was his testimony, and it was on Redirect Examination, that the gun discharged a split second later. McCord, who punched Perkins, said on Direct Examination, that the gun discharged a millisecond later. Dylan Grindol, who was some distance away, the motorcyclist, said that he could see the fight, the disturbance. And he could see the gun in the air. And he could see the wrestling going on, and he said that the gun discharged about two seconds later. McCord said that after the shot, Bryce Perkins was frozen like a ghost. Devon Lewis said that the gun was up prior to being fired, that it was being waved around, and Perkins was telling everybody to get back, back up. Jack Hart said the same thing and also said there was no aiming at any time.

4

The focus, in this matter today, is what was Bryce Perkins' intent on that morning, July 5th? Not only general intent but specific intent, specific intent to kill or inflict bodily harm.

The Jury made its decision. They made the decision, but I find that the evidence does not support Bryce Perkins having the specific intent to kill or inflict great bodily harm at that time the gun discharged.

His intent was to help his friend. He's waving the gun around. He's telling everybody to get back. There's some wrestling going on. He's caught up in the moment just as everyone else is. And I think that he did lose possession of his cool reflection, self-control -- Manslaughter. And I don't think that he had the specific intent to kill.

I've thought about it. I've replayed it in my mind. I may have gotten the sequence of events involving Korey King as to what point he grabbed the gun, but it doesn't change my opinion. It doesn't change what I feel I must do.

Later, the court engaged in the following colloquy with the prosecutor:

**MR. BRYANT:**

Well then, you must have disregarded their testimony, Your Honor.

**THE COURT:**

No, I didn't disregard it. There were other people that said that the gun was -- that Mr. Perkins was waving the gun around. I realize other witnesses said, at some point, the gun Mr. Perkins -- before the struggle over the gun with Pierce Johnson and the others, at one point, kind of leveled the gun off, swaying the gun from one side to another. One witness said that, at some point, the gun quit moving. I considered all of that. But taking everything together and the way this happened and after considering all the evidence and giving it serious thought and viewing the evidence in the light most favorable to the State, I don't feel that the evidence proves, beyond a reasonable doubt, that Bryce Perkins had the specific intent to kill or inflict great bodily harm. I find that he --

**MR. BRYANT:**

Well then, how is that Manslaughter, Your Honor?

5

**THE COURT:**

It's Manslaughter in the sense that it's a misdemeanor Manslaughter. He was engaged. He was trying to -- he did -- that was an Aggravated Assault.

**MR. BRYANT:**

So, it wasn't heat of passion because heat of passion requires a specific intent, Your Honor, but the crime is committed during heat of passion. And Your Honor indicated that your Ruling was that this was committed during heat of passion.

**THE COURT:**

No. I think he -- excuse me, Mr. Bryant. The Ruling is based primarily on the fact that I don't think the evidence proved that this happened -- excuse me -- Bryce Perkins had the specific intent to kill or inflict great bodily harm when the gun was discharged.

**MR. BRYANT:**

Then how is it Manslaughter, Your Honor?

**THE COURT:**

He was engaged in the perpetration of an Aggravated Assault. He said he was trying to scare everybody off.

**MR. BRYANT:**

I just wanted that for the record, Your Honor, because what you said initially was this was done during the heat of passion. There was a lot going on.

**THE COURT:**

I'm glad you -- I thought I did say also that I didn't think that the evidence proved, beyond a reasonable doubt, that he had the specific intent to kill. There was a misdemeanor Aggravated Assault with the weapon, waving it around and telling everybody to get back. Who wants some of this? All of those things were said.

**MR. BRYANT:**

But those were said before the shooting, Your Honor.

**THE COURT:**

Before the shooting, that's correct.

6

**MR. BRYANT:**

Correct.

**THE COURT:**

Yes, sir. Right.

**MR. BRYANT:**

After the round was put in the chamber and the safeties were taken off, that's when that was said.

**THE COURT:**

That is correct. That is correct.

Anything else, Mr. Bryant, right now?

**MR. BRYANT:**

Nothing other than our intent to appeal this Ruling, Your Honor.

The colloquy clarified that the trial court found there was insufficient evidence that Defendant had the specific intent to kill. Thus, the court found that a misdemeanor-manslaughter occurred.

As it is well-settled that intent may be inferred from a defendant's actions, the plethora of eyewitness testimony regarding Defendant's position and actions at the time he fired the shot is the key to the current analysis. Although the record contains pages of testimony regarding events earlier in the evening, such as a party on River Road that many of the witnesses attended and Taylor Johnson's behavior before the fight, testimony sheds no light on the issue at hand. Testimony regarding Defendant's actions after the shooting, such as his efforts to conceal the weapon, arguably has some relevance. The eyewitness testimony is far more important since it reveals his actions at the time he fired the gun.

As the trial court observed, Defendant arrived at the Prien Lake Road location to defend Johnson. Other than a phone call that alerted him to Johnson's

predicament, there is no indication that any earlier events influenced his intent at the time he pulled the trigger.

Also, while there were discrepancies among the testimonies of the various eyewitnesses regarding details of the Johnson fight and the shooting, only the details of the shooting itself are key to this analysis. For example, some witnesses, including Edmonson, stated that he and the victim intervened to stop people from kicking Johnson. Others did not recall such intervention or remembered someone else doing it. Such discrepancies went to credibility and weight and thus were matters for the jury, not the trial court or this court.

Regarding the fatal shot, note that witnesses Addison Nickel and Paige Sorkow saw merely the flash it produced. Louis Hoffpauir left before the fight involving Johnson even started. John Fayko did not see the shooting or even the flash. Edmonson testified he was walking away from Johnson and Defendant when he heard the shot. Ernest Celestie's testimony was similar. Cody Marceaux also stated he merely heard the shot.

Korey King, who started the fight with Johnson, provided details relevant to the shooting itself. According to King, Defendant arrived with a gun; he raised it over his head and chambered a round. King testified that he grabbed the barrel with his left hand, but Devon Lewis grabbed him, King, from behind and threw him down. King did not see the shot fired but heard it. Lewis's testimony was similar; he explained that he threw King into some bushes to keep him from getting shot. Lewis stated they both went down; he heard the shot, looked up, and saw the victim's head rock back.

Cale Brouillette saw Defendant and another young man, Austin Rousseau, walk up to where Johnson was lying. After bumping into Edmonson, Defendant turned to Rousseau and said, "Give it to me." Rousseau handed a pistol to

8

Defendant, who raised it over his head and chambered a round. Judson McCord then punched Defendant. Defendant sagged, and then rose. At that point, Pierce Johnson approached and tried to get the pistol away from Defendant. The latter man broke free and waved the gun while holding it "out straight," then fired. Brouillette saw the victim fall.

Like Brouillette, Jack Hart saw Defendant obtain the weapon from Rousseau, raise it, and chamber a round. He also saw McCord and Pierce try to subdue Defendant. They were unsuccessful, and Defendant pointed the weapon in the victim's direction. Unlike Brouillette, Hart testified Defendant did not wave the weapon before firing. The victim was "about the width of a normal driveway" from Defendant.

Judson McCord also heard Defendant say to Rousseau "Give it to me." Defendant waved the gun around, then lifted it over his head and chambered a round. While his hands were over his head, McCord punched him in the face. Defendant went down on one knee, then rose. According to McCord, Johnson then jumped on the gunman's back but was shaken off. The gun was out horizontally; Defendant waved it for "[a] millisecond, if that" and fired. McCord testified the gun was pointed in the general direction of at least four people, counting the victim and him. He felt the victim fall behind him. Immediately after the shooting, Defendant "froze, looked like a ghost."

Pierce Johnson's testimony was generally similar to McCord's regarding the struggle to subdue Defendant. Johnson explained that he tried to push the gun down, but Defendant regained control of it. He pointed in the general direction of four or five people and fired. Johnson did not see the gun waving; he stated "it was solid in the air" before it discharged.

9

Chance Fayko also testified about the struggle; his recollection of it was similar to those of McCord and Johnson. He testified that when Defendant got free of Johnson, he waved the gun "just a little bit," held it steady, then fired. There were people "in the line of fire," but Fayko was not sure how many. Joseph Polito testified that when Defendant got free of Johnson, he brought the weapon up, waved it slightly, and fired. His testimony suggested the victim was stepping toward him from behind when the pistol fired. Dylan Grindol was driving nearby on his motorcycle and had to stop because there were so many people in the road. From his vantage point, he saw an arm come up and pause for two seconds. Then a shot rang out, and he saw someone fall. He testified the weapon was not moving around when he saw it.

Viewing the testimony of the eyewitnesses in the light most favorable to the prosecution, a reasonable jury could have found that the State proved the element of specific intent beyond a reasonable doubt. Although McCord's testimony suggested the shot could have been accidental, as it came within a millisecond of his getting free of Johnson, Grindol's testimony regarding the two-second pause before the shot indicated it was deliberate. Jack Hart, Pierce Johnson, and Chance Fayko indicated the gun was steady before it was fired; this also suggested the shot was intentional.

It is well-settled that a jury is free to believe some, none, or all of any witness's testimony. Apparently, it credited testimony that Defendant paused before shooting. As shown in *Voorhies*, 590 So.2d 776, the trial court could not re-weigh the evidence in the considering the motion to acquit. Further, firing into a crowd is indicative of a specific intent to kill. *State in the Interest of L.H.*, 94-903 (La.App. 3 Cir. 2/15/95), 650 So.2d 433.

As mentioned earlier, Defendant also argues the killing was manslaughter because the actions of McCord, Johnson, and King provoked him. As observed earlier, the trial court's ultimate ruling was that the killing was a misdemeanor-manslaughter. However, we will address Defendant's provocation-based argument out of an abundance of caution.

We note the following analysis by the second circuit:

In the alternative, Defendant argues that the conviction should be reduced to manslaughter because he killed Ferguson in "sudden blood heat of passion" when Ferguson was fighting for the gun. In pertinent part, La. R.S. 14:31(A)(1) defines manslaughter as a "homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection." *State v. Ellis*, 42,286 (La.App. 2d Cir.7/11/07), 961 So.2d 636, *writ denied*, 07-1641 (La.1/25/08), 973 So.2d 753. "Sudden passion" and "heat of blood" are mitigating factors in the nature of a defense; and, when such factors are established by a preponderance of the evidence, a verdict for murder is inappropriate. *State v. Baker*, 41,555 (La.App. 2d Cir.8/15/07), 962 So.2d 1198, citing *State v. Leger*, 05-0011 (La.7/10/06), 936 So.2d 108, *cert. denied*, [549] U.S. [1221], 127 S.Ct. 1279, 167 L.Ed.2d 100 (2007). The burden is on the defendant to prove by a preponderance of the evidence that he acted in "sudden passion" or "heat of blood." *State v. Robinson*, 32,794 (La.App. 2d Cir.3/1/00), 754 So.2d 311, *writ denied*, 00-0989 (La.3/23/01), 787 So.2d 1008. The defendant is not obligated to establish the factors affirmatively; the jury may infer them from the evidence presented. *State v. Ellis, supra*, citing *State v. Jackson*, 34,076 (La.App. 2d Cir.12/6/00), 774 So.2d 1046.

Provocation shall not reduce a homicide to manslaughter if the jury finds that the defendant's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed. *State v. Ellis, supra*. "If a man unreasonably permits his impulse and passion to obscure his judgment, he will be fully responsible for the consequences of his act." *State v. Leger, supra*. Questions of provocation and time for cooling are questions for the jury to determine under the standard of the average or ordinary person with ordinary self-control. *State v. Leger, supra*, citing *State v. Deal*, 00-0434 (La.11/28/01), 802 So.2d 1254, *cert. denied*, 537 U.S. 828, 123 S.Ct. 124, 154 L.Ed.2d 42 (2002). Physical threats or actions on the part of the victim have been found to be sufficient provocation. *State v. Ellis, supra*, citing *State v. Lombard*, 486 So.2d 106 (La.1986); *State v. Ruff*, 504 So.2d 72 (La.App. 2d Cir.1987), *writs denied*, 508 So.2d 64, 65 (La.1987). Even so, mere words or gestures,

no matter how insulting, will not reduce a homicide from murder to manslaughter. *State v. Mitchell*, 39,202 (La.App. 2d Cir.12/15/04), 889 So.2d 1257, *writ denied*, 05-0132 (La.4/29/05), 901 So.2d 1063, citing *State v. Massey*, 535 So.2d 1135 (La.App. 2d Cir.1988).

Although Defendant had been shot during the struggle with Ferguson, he was actually shot by his accomplice, Foster. Further, when a victim is fighting back against two armed gunmen, actions of self-defense are not provocation to reduce a charge of second degree murder to manslaughter. Defendant fatally shot Ferguson during the perpetration of an aggravated burglary, armed robbery and aggravated kidnapping. Neither the fact that Ferguson acted in self-defense, nor the fact that Defendant was shot by his accomplice constitutes provocation to reduce the charge of second degree murder to manslaughter. Defendant, therefore, did not meet his burden of proving that he killed Ferguson while acting in "sudden passion" or "heat of blood;" and, thus, he is not entitled to a reduced verdict of manslaughter.

*State v. Wright*, 42,956, pp. 13-15 (La.App. 2 Cir. 3/5/08), 978 So.2d 1062, 1071-72, *writ denied*, 08-819 (La. 10/31/08), 994 So.2d 532. The actions of the young men who tried to disarm Defendant were legitimately defensive, and thus, Defendant cannot use them to establish provocation and reduce the conviction from second degree murder to manslaughter.

For the reasons discussed, the trial court's ruling is reversed, and the original conviction is re-instated.

## DISPOSITION

The trial court's ruling on the motion for post verdict judgment of acquittal is reversed. The jury verdict is reinstated, and the case is remanded for resentencing. The trial court is directed to inform Defendant of the provisions of Article 930.8 at resentencing.

**REVERSED AND REMANDED FOR RESENTENCING WITH INSTRUCTIONS.**