NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

10-1471

STATE OF LOUISIANA

VERSUS

LATONYA MICHELL YOUNG

************

APPEAL FROM THE
NINTH JUDICIAL DISTRICT COURT
PARISH OF RAPIDES, NO. 292,090
HONORABLE PATRICIA EVANS KOCH, DISTRICT JUDGE

************

JIMMIE C. PETERS
JUDGE

************

Court composed of Ulysses Gene Thibodeaux, Chief Judge, and Jimmie C. Peters and Shannon J. Gremillion, Judges.

CONVICTION AND SENTENCE VACATED; JUDGMENT OF
ACQUITTAL ENTERED.

James C. Downs
District Attorney
Monique Yvette Metoyer
Assistant District Attorney
Ninth Judicial District
P. O. Drawer 1472
Alexandria, LA 71309
(318) 473-6650
COUNSEL FOR APPELLEE:
      State of Louisiana

**Mark Owen Foster**
**Louisiana Appellate Project**
**P.O. Box 2057**
**Natchitoches, LA 71457-2057**
**(318) 572-5693**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    **Latonya Michell Young**

PETERS, J.

The defendant, Latonya Michell Young, appeals her conviction for theft of property having a value over $500.00, a violation of La.R.S. 14:67(A). For the following reasons, we vacate the conviction and sentence imposed, and enter a judgment of acquittal.

## DISCUSSION OF THE RECORD

The defendant began employment as utility clerk with the Town of Cheneyville, Louisiana (hereinafter sometimes referred to as the "Town" or "Cheneyville") in July of 2005. The criminal charge now before us arises because between July 2005 and October 2006, $27,900.00 collected from utility customers of the Town is unaccounted for. On May 21, 2008, the State of Louisiana (state) charged the defendant by bill of information with the theft of the unaccounted for funds, and following a May 19, 2010 bench trial, the trial court found the defendant guilty as charged. Thereafter, on June 3, 2010, the trial court sentenced the defendant to serve seven years at hard labor, but suspended the incarceration sentence and placed her on five years supervised probation. Included within the terms of supervised probation was restitution to Cheneyville of the money taken.

The evidence presented at trial establishes that during the time period at issue, the Town maintained a multi-step collection process for utility payments which included no system of checks and balances. The collection process occurred in a 600-square-foot room in the Town's municipal building, which housed three different workers: the town clerk, the water superintendent, and the utility clerk. Royston Charrier, Jr. served as water superintendent during the entire time at issue, and Paula Beaver came to work as town clerk in December of 2005.

The principal responsibility for collecting and processing the utility payments rested with the utility clerk. When a customer made a payment, the utility clerk would receive the payment and initially place it in a drawer in the office. Anyone who had access to the room had access to the drawer. A customer's payment would generally be accompanied by the standard two-part statement, which had been sent to the customer advising him of the amount due.[1] The utility clerk would stamp both portions of the statement and return one portion to the customer. Using the other portion of the statement, or "stub" portion as it is referred to in testimony, the utility clerk would locate the duplicate statement in the utility book, stamp that duplicate statement as paid in full, and place a notation on the statement as to the nature of the payment, i.e., check or cash. Toward the end of the day, the utility clerk would use the accumulated stubs to enter the transactions into the computer. The computer printout generated by these entries would divide the payment and credit a portion to the water account, the sewer account, and the gas account. These figures were then used by the utility clerk to prepare deposit slips for the moneys collected during the day. The funds were then locked in a bank deposit bag and dropped in the night deposit window of the local bank.

With regard to security, the evidence established that the drawer where the payments were initially deposited was secured by a key lock, but the key itself was seldom removed from the drawer.[2] Additionally, Ms. Beaver was the individual who

---

[1]If the customer did not have his statement or if a new customer appeared, a handwritten statement was produced and stamped in the same manner as the monthly statements.

[2]Mr. Charrier, Ms. Beaver, and the defendant all testified that the key generally remained in the drawer because if the defendant was required to leave the office for any time at all, either Mr. Charrier or Ms. Beaver would service any customer that may come in to pay a bill.

took the bank deposit bag each evening, and she carried with her the key to the bag as well as the key to the night deposit window.

From the time the defendant began employment in July of 2005 through early October of 2006, there were no suspicions of wrongdoing on the part of anyone with regard to the utility deposits. However, on October 12, 2006, Ms. Beaver contacted the Rapides Parish Sheriff's Office concerning a single suspicious transaction involving Chris Jones, a Town customer. Mr. Charrier testified that he was present when Mr. Jones came to the office and payed a $125.00 connection fee.[3] Immediately after the defendant received the payment and placed it in the drawer, she generated a statement, stamped it, and returned the appropriate copy to Mr. Jones. She then generated a work order and gave it to Mr. Charrier for him to connect service to Mr. Jones' residence. Mr. Charrier left immediately to make the connection.

Ms. Beaver testified that later in the day, she discovered the Town's stub under the defendant's keyboard,[4] and noticed that the $125.00 deposit was no longer in the locked drawer. At trial, she produced an undated computer printout which she suggested reflected the bank deposit for that day.[5] Mr. Jones' name did not appear on the undated printout. She provided Rapides Parish Deputy Sheriff Jerry Rollins with a copy of the stub she found when he interviewed her on October 12, 2006, but did not provide him with the undated computer printout.[6]

---

[3]However, Mr. Charrier could not recall whether Mr. Jones paid by cash or by check.

[4]She never explained why she was looking under the defendant's keyboard.

[5]The defendant objected to the introduction of the computer printout, and that issue is the subject of one of the assignments of error.

[6]She also asserted that she found a number of other stubs in the back portion of the drawer, but did not give them to Deputy Rollins. Instead, she stated she gave them to the auditor.

Roy Derbonne, a certified public accountant, began working on his annual audit at about the time law enforcement became involved,[7] and almost immediately recognized that funds were unaccounted for in the general utility accounts. He explained the process of discovery as follows:

> [O]riginally you looked at - we tested receipts for a particular day and, you know, probably for a week or so and discovered that the receipts that were written, all the money did not go into the bank. So at that point auditing procedures would tell me that I had to expand my audit and when I did that we went back and tested every receipt for every utility bill for the fiscal year that ended on June the 30th of 2006.

He then brought the process forward through October of 2006 and discovered that $27,986.31 was collected but not deposited.[8] The individual incidences where Mr. Derbonne's investigation reflected that the records contained a receipt but no stub to match a received payment, were consolidated in table form on a month-by-month basis beginning in August of 2005,[9] and ending October 13, 2006. Based on his evaluation of the records before him, he concluded that all the funds at issue had been initially received by the defendant from the customer.

Neither Mr. Charrier nor Ms. Beaver ever observed the defendant taking any money from the funds she received. Although Ms. Beaver was responsible for subsequent bank-statement reconciliations, she did not notice any problems with the bank statements during the particular time the money disappeared. However, she explained that so long as she did not have access to the other records maintained by the defendant, simply reconciling the bank statements would not allow her to detect

---

[7]Mr. Derbonne testified that he began his annual audit activities in September or October of 2006.

[8]This total included $600.00 that was missing from the fines and forfeitures account, and $375.81 in the property tax account.

[9]Although Mr. Derbonne testified that his investigation covered July of 2005, the report contains no entries for missing funds in that month.

4

a problem with the deposits. All of the information she used to reconcile the bank statements was provided by the defendant, and she trusted the defendant to be honest with her in these matters.[10]

The defendant testified at her trial and stated that she did not take any of the missing money. Furthermore, she denied ever collecting any property tax or fines and forfeitures payments.[11] She asserted that while her responsibility did include accepting utility payments and properly logging them in, there did exist a system of checks and balances because Ms. Beaver double checked her calculations each afternoon. In explaining the process, the defendant stated that when a customer gave her a bill and payment, she would circle and initial the form of payment and then put the money and stub in the drawer. At the end of the day, she would remove the money and stubs from the drawer, enter the transactions into the computer, and generate a print-out. After assuring herself that the amounts matched the various accounts, she would provide Ms. Beaver with the computer printout, the stubs, and the financial books of the various Town departments for Ms. Beaver to double-check her calculations. According to the defendant, it was Ms. Beaver who then placed the deposit in the bank bag, locked it, and carried it to the bank.

With regard to the $125.00 payment by Mr. Jones, the defendant acknowledged receiving the payment and stated that she left the stub next to her computer keyboard after she completed her work order and gave it to Mr. Charrier. She then left for lunch. When provided with the copy of the undated computer printout testified to by

---

[10]None of the evidence presented explained how a customer's payment could be diverted to a thief without an entry somewhere in the system to suggest in the next month's payment cycle that the particular customer had not paid his or her bill.

[11]The state produced no documentation to establish that the defendant was the person who collected the amounts at issue in these categories.

Ms. Beaver, the defendant pointed out that the printout was not from the utility account records, but was a meter-reading document generally kept by Mr. Charrier in his capacity as water superintendent.[12]

While not specifically stating that Mr. Charrier or Ms. Beaver had taken the missing funds, the defendant pointed out that the key remained in the deposit drawer at all times, and she was absent at some time every day to perform other duties, go to lunch, or go to the bathroom. In fact, she suggested that when she asked to keep the key on her person, she was told that the key was to remain in the keyhole at all times. Still, she had no reason to believe any money was missing because she tallied everything at the end of the day. She did note, however, that Ms. Beaver was the last person to handle the money before it arrived at the bank. However, she did acknowledge on cross-examination that if Ms. Beaver had taken money from the deposit after the defendant had filled out the deposit slips, Ms. Beaver would have had to change the deposit slip and, thus, the deposit slip would no longer have the defendant's handwriting. She also agreed that if anything was taken, it was probably taken before she completed the deposit slips.

In her three assignments on appeal, the defendant challenges the sufficiency of the evidence, certain trial court rulings, and whether the trial court applied the appropriate burden of proof. We find merit in the defendant's first and third assignments of error and will consider them together.

## *Assignment of Error Numbers One and Three*

By the first assignment of error, the defendant argues that the evidence was insufficient to convict her of the offense charged. In asserting this assignment of

---

[12]The exhibit does contain columns of numbers more consistent with meter reading numbers than with money deposits.

error, she argues that the evidence used against her was entirely circumstantial and that it did not sufficiently exclude every reasonable hypothesis of innocence. By the third assignment of error, the defendant argues that the trial court applied the wrong burden of proof in determining her guilt.

The appellate procedure for considering a claim of insufficient evidence is well-settled:

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979); *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See State ex rel. Graffagnino*, 436 So.2d 559 (*citing State v. Richardson*, 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

*State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371. Additionally, La.R.S. 15:438 provides that "[t]he rule as to circumstantial evidence is: assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." Additionally, as noted in *State v. Neal*, 00-674, p. 9 (La. 6/29/01), 796 So.2d 649, 657, *cert. denied*, 535 U.S. 940, 122 S.Ct. 1323 (2002), "[t]his statutory test works with the *Jackson* constitutional sufficiency test to evaluate whether all evidence, direct and circumstantial, is sufficient to prove guilt beyond a reasonable doubt to a rational jury. *State v. Rosiere*, 488 So.2d 965, 968 (La.1986)."

Louisiana Revised Statutes 14:67(A) provides:

> Theft is the misappropriation or taking of anything of value which belongs to another, either without the consent of the other to the misappropriation or taking, or by means of fraudulent conduct, practices, or representations. An intent to deprive the other permanently of whatever may be the subject of the misappropriation or taking is essential.

In this assignment of error, the defendant does not dispute the evidence that some of the Town's utility funds are unaccounted for. Instead, she argues that absent any direct evidence establishing that she was the individual who took the missing money, the circumstantial evidence presented by the state was insufficient to prove her guilt beyond a reasonable doubt. Thus, the only element of proof required in La.R.S. 14:67(A) at issue is the identity of the individual who stole the money.

The state produced evidence to establish that the defendant, as the individual who generally received the customers' payments and who processed the receipts thereafter, clearly had the opportunity to take the missing funds. Additionally, Mr. Derbonne's investigation revealed that the personal notations on an overwhelming majority of the daily records of days where money was not properly deposited were entered by the defendant. However, the evidence also established that either Mr. Charrier or Ms. Beaver (or both individuals) had access to the funds on each day they were collected from the time of collection until the daily deposit was dropped into the night deposit slot at the bank. Furthermore, Mr. Derbonne testified that the best he could say was that it "[w]as very possible" that the defendant took the missing funds. When it was pointed out to him on cross-examination that some of the receipts contained Ms. Beaver's initials, he discounted this finding by suggesting that "the person who had the oversight or the control of that drawer was [the defendant]." He also had to admit that in reaching his conclusions, he assumed that the defendant was

8

the person who transported the money to the bank each day.[13]  Additionally, he

acknowledged that when the defendant was absent from the office, the others present

had the same opportunity to remove the money as did the defendant.

In its reasons for ruling, the trial court seemed to struggle with the evidence

before it.  Noting that the environment established by the "terrible accounting

practices" of the Town allowed "theft or misappropriation to occur fairly easily," and

recognizing that the state's "evidence was limited" the trial court stated:

> What I have heard is that Ms. Young had the control or the
> responsibilities as utility clerk over stubs that were issued, meaning the
> customers came in and she got to keep the other part of the stub of a
> payment.  She had control over the cash that was then given to her, cash
> or check, the funds that were given to her, placed in a drawer.  Although
> the drawer was open to many people, but it was part of her job or
> responsibility to take care of that.  She also had, which is key, control of
> what information went to the computer system.  Computers will only
> spit out information that is put into them.  They cannot put out
> information that is not put into them, and that's a key factor here.  And
> so Ms. Young had control of whatever information went into the
> computer system.  Which that information that went into the computer
> system later printed out a report that was used to calculate a deposit.  So
> I find that to be a key - key factor.  It was only through that printout and
> the tallying of the dollars that were reported in that printout were then
> used for the documentation to any tallying efforts that might have gone
> on, loosely that they were, then place any of those funds into the bank
> deposit.  So the dollars and the flow, the ones that come to - the stub, the
> drawer, what goes into the computer system is where I see the practices
> failed miserably.  And so the defendant too also participated in some
> terrible accounting practices.  Even though we know now as a result of
> the audit there were some other checks and balances that were available
> to that community like figuring out what the customer book might say
> or what the receipt book might say, doesn't appear that there was any of
> those thorough accounting practices done in any of the deposit,
> registering the deposits.  So that has concerns for me.  What I also heard
> today was that other employees that worked there, Ms. Beavers[sic]
> came after Ms. Johnson's employment and then left after Ms. Johnson
> left and that Mr. Charrier was in and out of the office.  I know that the
> drawer was open to many but still the inputting of the information into
> the computer was solely Ms. Young's responsibility.  So the evidence
> today I find does support the charge *by a preponderance of the evidence*

---

[13]He testified that this assumption was based on information supplied to him by Ms. Beaver.

that there was theft over five hundred dollars. What I also see in the report from the accountant was some occupational so I'm uncertain - it's definitely over five hundred, I don't know that I'm going to say this twenty-seven thousand, so that's where it's looking at. So I maybe need some more as we're looking at some sentencing guidelines but I do find the State has proven their case *by a preponderance of the evidence* theft over five hundred. Isn't that what the charge was?

(Emphasis added).[14]

Thus, as we interpret the reasons for ruling, the trial court seems to have accepted Mr. Derbonne's position that because the defendant had oversight and control, she is responsible for the theft. At the same time, the trial court seemed to reject Mr. Derbonne's testimony concerning the amount stolen. Although it is implicit in the reasons for ruling, the trial court did not address whether the state overcame every reasonable hypothesis of innocence, i.e., the access others had to the missing funds.

In her last assignment of error, the defendant correctly points out that the trial court articulated the wrong standard of proof applicable to the state: preponderance of the evidence. Louisiana Revised Statutes 15:271 provides that the state must prove "beyond a reasonable doubt each element of the crime necessary to constitute the defendant's guilt."

Immediately after the trial court completed its reasons for ruling, counsel for the state sought permission to approach the bench and an off-the-record conference followed. At the end of that conference, the trial court made the following statement:

I'm used to my standard in my court is clear and convincing. Got close to that, it's beyond a reasonable doubt. No doubt about it, for me.

The trial court then elaborated on its prior reasons for ruling with the following additional comment:

_____

[14]It is this italicized language that forms the basis of the defendant's third assignment of error.

And even though it's based - I know it bothers attorneys to hear circumstantial but it was just all the steps that were involved in that that causes me great concern for me to believe that's where the control was.

At first glance, it appears that the trial court articulated the correct burden of proof after the bench conference. However, as pointed out by the defendant on appeal, in this statement, the trial court found that the state's evidence did not quite meet the clear and convincing evidence standard, but did meet the proof beyond a reasonable doubt standard. The latter standard is a higher standard than clear and convincing. That being the case, the trial court erroneously concluded that the state had met its burden of proof. Based on the trial court's conclusion that the state failed to meet the clear and convincing standard of proof (and therefore failed to meed the proof beyond a reasonable doubt standard), the trial court erred in finding the defendant guilty as charged.

## DISPOSITION

For the foregoing reasons, we vacate the defendant's conviction and sentence and enter a judgment of acquittal.

**CONVICTION AND SENTENCE VACATED; JUDGMENT OF ACQUITTAL ENTERED.**

This opinion is NOT DESIGNATED FOR PUBLICATION. Rule 2-16.3, Uniform Rules—Courts of Appeal.

11